**Larry SCOTT, Appellant–Respondent**

v.

**Sharon SCOTT, Appellee–Petitioner.**

**No. 36A05–9506–CV–216.**

Court of Appeals of Indiana.

June 25, 1996.

Nancy G. Endsley, Indianapolis, for Appellant.

William E. Vance, Vance & Phillips, Seymour, for Appellee.

## OPINION

SHARPNACK, Chief Judge.

Larry Scott appeals the trial court's child support award and the distribution of assets in the dissolution proceedings against his wife, Sharon Scott. Larry raises four issues for our review which we restate as the following five issues:

1. whether the doctrine of collateral estoppel prevented the trial court from determining Larry's potential income in accordance with the Indiana Child Support Guidelines;

2. whether the trial court was required to deduct from Larry's support obligation the social security disability benefits which Larry's son received as a result of Larry's disability;

3. whether the trial court provided an adequate basis for its child support award;

4. whether the trial court failed to make a just and reasonable distribution of the marital property; and

5. whether the trial court abused its discretion by awarding attorney's fees to Sharon.

We affirm in part, reverse in part, and remand.

The facts most favorable to the judgment follow. Larry and Sharon married on August 31, 1975. During the marriage, the couple had two children named Ryan and Nathan. Larry owned and operated Scott Sales & Service, a used car lot, since 1973. In 1981, Larry was burned in an accident and suffered third degree burns on more than one third of his body. Larry continued to own the business.

On March 16, 1994, Sharon filed a petition for dissolution of marriage. On February 28, 1995, the trial court entered its findings of fact and conclusions thereon for the dissolution of the marriage, the amount of child support, and the distribution of assets. Larry now appeals.

### Standard of Review

When reviewing the trial court's findings of fact and conclusions thereon, we apply a two-tiered standard of review. *W & W Equip. Co. v. Mink,* 568 N.E.2d 564, 569 (Ind.Ct.App.1991), *reh'g denied, trans. denied.* First, we consider whether the evidence supports the findings. In determining whether findings are clearly erroneous, we construe the findings liberally in support of the judgment. *Citizens Progress Co. v. James O. Held & Co.,* 438 N.E.2d 1016, 1022 (Ind.Ct.App.1982). The findings are clearly erroneous only when a review of the record leaves us firmly convinced a mistake has been made. *Cooper v. Calandro,* 581 N.E.2d 443, 444–445 (Ind.Ct.App.1991), *reh'g denied, trans. denied.*

Next, we determine whether the findings support the judgment. A judgment is clearly erroneous when unsupported by the findings of fact and conclusions thereon. *DeHaan v. DeHaan,* 572 N.E.2d 1315, 1320 (Ind.Ct.App.1991), *reh'g denied, trans. denied.* In applying this standard, we neither reweigh the evidence nor judge the credibility of the witnesses. *Donavan v. Ivy Knoll Apts. Partnership,* 537 N.E.2d 47, 50 (Ind.Ct. App.1989). Rather, we consider the evidence that supports the judgment and the reasonable inferences to be drawn therefrom. *Id.* Finally, we must affirm the judgment of the trial court unless the evidence points incontrovertibly to an opposite conclusion. *Id.*

### I.

The first challenge raised by Larry is whether the trial court erroneously calculated his potential income, which in turn was used to calculate the child support award. Child support orders are governed by the Indiana Child Support Rules and Guidelines, which are based on our statutory framework. *See* Child Supp. G. 1, commentary; *see also,* Ind. Code § 31–1–11.5–11(c). An award of child support is committed to the sound discretion of the trial court and will not be overturned unless clearly erroneous. *Carr v. Carr,* 600 N.E.2d 943, 945 (Ind.1992). An order is clearly erroneous when it is clearly against the logic and effect of the facts and circumstances before the reviewing court. *McGinley–Ellis v. Ellis,* 638 N.E.2d 1249, 1252 (Ind.1994).

The first step in establishing a child support award is to determine the weekly

gross income of each parent. To do so, we are bound by the guidelines, which provide in part:

"1. *Definition of Weekly Gross Income* .... For purposes of these Guidelines, 'weekly gross income' is defined as actual weekly gross income of the parent if employed to full capacity, potential income if unemployed or underemployed and imputed income based upon 'in-kind' benefits ....

2. *Self–Employment, Business Expenses, In–Kind Payments and Related Issues.* Weekly Gross Income from self-employment, operation of a business ... is defined as gross receipts minus ordinary and necessary expenses. In general, these types of income and expenses from self-employment or operation of a business should be carefully reviewed in order that the deductions be restricted to reasonable out-of-pocket expenditures necessary for the production of income ....

3. *Unemployed, Underemployed, and Potential Income.* If a parent is voluntarily unemployed or underemployed, child support shall be calculated based on a determination of potential income. A determination of potential income shall be made by determining employment potential and probable earnings level based on the obligor's work history, occupational qualifications, prevailing job opportunities, and earnings level in the community ...."

Child Supp. G. 3(A)(1–3).

In 1981, Larry was burned in an accident in which he received third degree burns on approximately 35% of his body. The burns severely limited Larry's use of his left hand and arm, limited his neck movement, and caused extreme sensitivity to heat and cold. In 1982, as a result of the accident, the Social Security Administration ("SSA") determined that Larry was disabled and began to forward social security disability payments to him. Currently, Larry receives $693.00 per month. In addition, Nathan, Larry's youngest son, receives a payment of $178.00 per month as a result of Larry's disability.[1]

Larry testified at the dissolution proceedings that the disability payments were his sole source of income. However, he still owned the business at that time. Notwithstanding Larry's testimony, the trial court found that Larry was capable of earning additional money based on his ownership of the business. The trial court determined that the business could generate a profit providing income to Larry because:

"The Husband has continued to operate Scott Sales & Service, ostensibly at a nominal profit or at a loss, at least back to 1990, the earliest year addressed by the evidence presented. The Court finds that the success or failure of the business depended primarily upon the Husband' efforts, despite assistance contributed by the Wife. He testified that from some point in time not long before the separation of the parties, he has operated the business as an informal partnership with Ryan, the oldest son of the parties, with Ryan selling the vast majority of the automobiles and the Husband paying the bills. The Husband testified that this arrangement is to assist Ryan in paying for his college education. However, Ryan's [sic] resides with his mother and brother without contribution to room and board and his college expenses are, ... paid for essentially by gifts from the paternal grandparents. This seemingly inconsistent testimony is reconcilable only by finding that the Husband has paid the overhead of the business, exclusive of cost of goods sold by Ryan, and that both the Husband and Ryan have traded and sold vehicles at the location, each keeping for himself the net profit from the sale of any vehicle purchased or traded for and subsequently sold by him.

Whether or not the Husband has minimized his own sales since the marital situation worsened, resulting in separation and this dissolution, attributing most of the sales to Ryan as he paid the overhead associated with the business, is a fair ques-

---

**1.** Larry's oldest son, Ryan, similarly received disability payments until he turned eighteen years of age.

tion which cannot be expressly resolved by the evidence presented.

\*    \*    \*    \*    \*    \*

The Husband's contention is that the real estate has little or no net value and that the business is, at best, a break even proposition. However, he is adamant about being awarded the real estate and maintaining the auto sales. The evidence shows that Ryan has been an adept young businessman, accumulating ten unencumbered vehicles of his own, paying his own transportation and other expenses, and accumulating a net worth, exclusive of gifts from his grandparents, of approximately $30,000.00, largely over the last couple of years, all while going to high school and college and working only on evenings and weekends. The Husband's summarized and undocumented records show a reasonable profit .in the first quarter of 1994 (even after full payment of the annual insurance premium during the quarter) and a loss for the remainder of the year, during which time he contends that he inexplicably sold vehicles for essentially what he had in them, contrary to logic and the documented results of other periods of operation.

*The Court finds that the Husband's evidence is not credible and rejects his contention that the business is unprofitable.* Construing the Husband's evidence against him and in the light most favorable to the Wife, it would appear from the Operating Statement for the first quarter of 1994 that the business is capable of generating net profit, prior to taxes, in the order of $400.00 net per week, or approximately $20,000.00 per year. An absolute rock-bottom reasonable assumption would be the equivalent of minimum wage, or $174.00 per week. Allowing for the possibility that the first quarter of 1994 was an exceptionally good quarter, giving consideration to Ryan's sales and financial results at the same site, and choosing to remain within the extremes of calculation, something in the order of $300.00 per week, or an amount roughly equal to the Wife's wages, would be a reasonable conclusion. *The Court finds that .the Hus-band's net income from the business is roughly equal to the Wife's weekly wages from her employment, giving all due consideration to the informal partnership with Ryan."*

Record, pp. 16–17, 19 (emphasis added). Accordingly, the trial court calculated Larry's potential income at $300.00 per week. Larry argues first that the trial court acted contrary to law when it imputed potential income to him and second, that the trial court imputed too much income. We address each of these contentions in turn.

### A. *The Trial Court's Authority to Calculate Potential Income*

■ Larry argues that the trial court improperly imputed income to him based upon the potential profitability of the business. He argues that the trial court was prohibited from calculating potential income pursuant to Child Supp. G. 3(A)(3) because he is disabled and, therefore, not "voluntarily" unemployed or underemployed as a matter of law. Larry characterizes the trial court's action as an "impermissible collateral attack" on the SSA's determination that he is disabled.

Sharon does not specifically address Larry's contention that the trial court engaged in an impermissible collateral attack of the SSA's determination. Instead, she claims the evidence produced at trial demonstrated that Larry worked at his business. She relies on Child Supp. G. 3(A)(2) to support her contention that the trial court has great discretion to evaluate a self-employed spouse's financial situation based on the evidence. As a result, Sharon argues that the trial court properly established a reasonable level of income for Larry because it found Larry's evidence with respect to the poor profitability of the business not credible.

Initially, we note that this case is unique because the trial court imputed potential income to Larry based on his status as a self-employed spouse. In many cases, the trial court calculates the potential income for a spouse found to be voluntarily unemployed or underemployed. In other cases, the trial court examines a self-employed spouse's financial capacity and determines whether that

spouse has minimized income in an effort to avoid payment of significant support. The present case is unusual because it involves a self-employed spouse who possibly minimized his sales at the business to avoid paying more child support. As a result, the trial court combined the guidelines which govern a self-employed spouse with those which govern a voluntarily unemployed or underemployed spouse. While different standards govern each of these issues, the principles underlying both guidelines applies to the present situation.

■ First, the trial court considered Larry's financial capacity as a self-employed spouse. *See* Child Supp. G. 3(A)(2) (stating that "income and expenses from self-employment or operation of a business should be carefully reviewed"); *see Merrill v. Merrill,* 587 N.E.2d 188, 190 (Ind.Ct.App.1992) (holding that the guideline "clearly vests discretion with the trial court to scrutinize the self-employed parent's financial situation closely ...."). To review Larry's financial capacity, the trial court properly examined the tax returns and operating statements of the business to ascertain the profit amount which Larry could reasonably generate from the business. *See In Re Paternity of Thompson,* 604 N.E.2d 1254, 1256 (Ind.Ct.App.1992), *reh'g denied* (holding that the determination of a self-employed spouse's weekly gross income presents a "unique challenge for a trial court" and, thus, requires the trial court to scrutinize income tax returns and other forms of financial data).

■ In addition to determining Larry's financial capacity as a self-employed spouse, the trial court considered whether Larry purposely minimized his sales and remained voluntarily underemployed pursuant to Child Supp. G. 3(A)(3). As previously established, the trial court is authorized to impute potential income to a spouse who is voluntarily unemployed or underemployed. It is well within the trial court's discretion to determine the amount of potential income when a parent has either no income or only means-tested income and the parent "is capable of earning income or capable of earning more." Child Supp. G. 3, commentary. "One purpose of potential income is to discourage a

parent from taking a lower paying job to avoid the payment of significant support." *Id.* Taking these provisions together, the trial court was authorized to evaluate the profitability of Larry's business and to impute income therefrom.

Having determined that the trial court had the general authority to impute income, we turn to Larry's argument that, in this case, the trial court could not impute income to him because of the SSA's prior determination that he is disabled. Under the Social Security Act a person may qualify for such benefits if the individual has a "disability." This term is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months...." 42 U.S.C. § 423(d)(1)(A). As a threshold matter, a disability claimant cannot qualify for benefits if engaged in substantial gainful activity. *Id.; see Barber v. Sullivan,* 765 F.Supp. 58, 61, n. 1 (W.D.N.Y.1991). To make this determination for a self-employed spouse, the SSA considers several factors:

> "20 C.F.R. § 404.1575(a) contains evaluation guides for the determination of whether a self employed individual, such as plaintiff, engages in substantial gainful activity. Pursuant to that section, the determination of whether a self employed individual is involved in substantial gainful activity requires consideration of factors beyond ' ... income alone ...,' including an individual's ' ... activities and their value to the business ... regardless of whether ....' the individual receives an ' ... immediate income ...' for his services. 20 C.F.R. § 404.1575(a)(1)-(3) contain essentially three separate tests any one of which, if met, establish that a self employed individual is engaged in substantial gainful activity."

*Barber,* 765 F.Supp. at 61. In this case, Larry argues that because the SSA already found him "unable to engage in any substantial gainful activity," the trial court was prohibited from then calculating potential income based on his ownership of the business.

Essentially, Larry argues that the issue has already been litigated and that the trial court was bound by the SSA's determination that Larry is unable to work. We disagree.

■■■ The principle of res judicata prevents the repetitious litigation of that which is essentially the same dispute. *Liberty Mutual Ins.Co. v. K.A.T., Inc.*, 855 F.Supp. 980, 985 (N.D.Ind.1994). The doctrine of res judicata is divided into two distinct branches, claim preclusion and issue preclusion. *Progressive Casualty Ins. Co. v. Morris*, 603 N.E.2d 1380, 1382 (Ind.Ct.App.1992). Issue preclusion, which is also referred to as collateral estoppel, precludes relitigation of issues actually and necessarily decided in an earlier litigation between the same parties or those in privity with the parties. *Sullivan v. American Casualty Co.*, 605 N.E.2d 134, 137 (Ind.1992). Although the boundaries of applying collateral estoppel by administrative decisions to court litigation are not well defined in this state, our supreme court has approved the use of collateral estoppel to issues previously decided by administrative agencies in some cases. *See McClanahan v. Remington Freight Lines*, 517 N.E.2d 390, 394 (Ind.1988); *Peabody Coal Co. v. Indiana Dep't of Natural Resources*, 629 N.E.2d 925, 929 (Ind.Ct.App.1994), *affirmed by*, 664 N.E.2d 1171 (Ind.1996); *see also, Spearman v. Delco Remy*, 717 F.Supp. 1351, 1357 (S.D.Ind.1989). In determining whether an administrative determination should estop a subsequent litigation, the trial court should consider: (1) whether the issues sought to be estopped were within the statutory jurisdiction of the agency; (2) whether the agency was acting in a judicial capacity; (3) whether both parties had a fair opportunity to litigate the issues; and (4) whether the administrative tribunal could be appealed to a judicial tribunal. *McClanahan*, 517 N.E.2d at 394. In addition to these requirements for administrative collateral estoppel, two requirements implicit in all types of collateral estoppel must also be considered. *Spearman*, 717

F.Supp. at 1357. These requirements are whether the issues sought to be barred are the same and whether the parties are the same in both proceedings. *Id.* Applying these principles to the present facts, we find that two elements are not satisfied: whether the issue is the same and whether the parties are the same.

First, the issue is not the same in both proceedings. During the administrative hearing before the SSA, the issue was whether Larry had a "disability" and, thus, whether he was unable to engage in substantial gainful activity.[2] *See* 42 U.S.C. § 423(d)(2)(B). The issue in the present case is whether Larry's weekly gross income for child support purposes should include potential income from his business. Simply because the SSA found Larry to be disabled under the federal statute did not prohibit the trial court from calculating Larry's weekly gross income under the state child support guidelines and based on the evidence at trial. While the resolution of the issue in this case inherently involved an examination of Larry's capability to generate income from the business, the ultimate issues in both proceedings are not the same.

The second element of the collateral estoppel test that is not satisfied by the circumstances before us is the requirement for the proceedings to have the same parties. While Sharon may have been indirectly involved in the administrative hearing, she clearly was not a party. The hearing resulted from Larry, the disability claimant, filing an application with the SSA; the parties at the hearing were Larry and the commissioner for the SSA. Because Sharon was not a party to the proceeding, she did not have a full and fair opportunity to litigate the issue of Larry's ability to work or otherwise generate income, which is necessary for the principles of collateral estoppel to apply.

Moreover, the relationship between Larry and Sharon has substantially changed. When Sharon was Larry's wife, she enjoyed

---

**2.** At this point, we note that the record is devoid of any evidence concerning the administrative hearing, including a transcript of the hearing, the order finding Larry "disabled," and the issues addressed. Instead, the record is basically limited to Larry's testimony during the dissolution proceedings that he was severely burned in a fire, has limited use of his body, and collects disability payments. As such, we can only speculate as to the nature of the administrative hearing.

the benefit of Larry's disability payments. At that point, it was clearly within Sharon's interest to support the SSA finding that Larry was unable to engage in substantial gainful activity. Presently, however, Sharon testified that Larry is capable of generating an income on a steady basis and that he is, in fact, working at the business. Given Sharon's current circumstance and her desire to increase Larry's child support obligation, Sharon is motivated to raise her concerns about Larry's ability to work notwithstanding any reluctance to do so during the administrative hearing. These concerns were clearly reflected in the trial court's order which suggested that a "fair question" had been raised as to whether Larry minimized his own sales or attributed most of them to the oldest son. Record, p. 20. Thus, not only was Sharon not a party to the administrative proceeding but her interests have changed so dramatically that she cannot be held to have had a fair and full opportunity to litigate the issue.

Considering the fact that the issues and the parties in the proceedings are different, fairness requires that we do not apply the doctrine of administrative collateral estoppel. *See McClanahan,* 517 N.E.2d at 395. Accordingly, the trial court properly considered the amount of Larry's potential income despite the agency's determination that he is disabled.

In rendering our decision, we are mindful of two recent cases cited by Larry to support his argument that the action undertaken by the trial court constituted an impermissible collateral attack. *See Cox v. Cox,* 654 N.E.2d 275 (Ind.Ct.App.1995); *Holiday v. Holiday,* 644 N.E.2d 880 (Ind.Ct.App.1994). In addition, we must also consider our decision in *Esteb v. Enright by State,* 563 N.E.2d 139 (Ind.Ct.App.1990) which underlies both the *Cox* and *Holiday* opinions. These cases have a procedural posture different than the present case. Both *Cox* and *Esteb* involved appeals from a contempt order for failure to pay child support. *Cox,* 654 N.E.2d at 276; *Esteb,* 563 N.E.2d at 140. In *Holiday,* the husband appealed the trial court's denial of his motion to vacate the continuing order of contempt. *Holiday,* 644 N.E.2d at 882. In

these cases the primary issue was whether the parent met the burden of proving that the failure to comply with the child support order was not willful or otherwise excused. *See, e.g., Esteb,* 563 N.E.2d at 141. Further, all involved supplemental security income ("SSI") recipients who received income under Title XVI of the Social Security Act, a federal social welfare program. In all three cases, we found that the SSI recipient was excused from paying child support because the SSI recipient "as a matter of law, lacks the money or means to satisfy his child support obligation." *Cox,* 654 N.E.2d at 277; *see Holiday,* 644 N.E.2d at 882; *Esteb,* 563 N.E.2d at 142; *see also* Child Supp. G. 3, commentary.

However, Larry is not similarly excused from paying child support. In fact, the guidelines and the commentary expressly require that Larry's disability benefits be included to compute Larry's weekly gross income. *See* Child Supp. G. 3(A), commentary (stating that "[m]eans-tested public assistance programs (those that are based on income) are excluded from the computation of weekly gross income, but other government payments, such as social security benefits ... should be included."); *see also, Esteb,* 563 N.E.2d at 141, n. 2. Larry concedes that his benefits were properly considered in the trial court's calculation of the support award.

Moreover, the evidence at trial supported the conclusion that Larry could work and generate an income on a steady basis. *Cf. Holiday,* 644 N.E.2d at 882. Even in his appellate brief, Larry acknowledged that he owns the business and participates in it. While Larry claims that such work has not resulted in income to him, the admission nonetheless supports the finding that Larry is capable of working and generating income on a regular basis. At trial, Ryan testified that Larry helps with the painting and body work of the cars in the shop. As a result, Larry does not lack the money or means to pay the support. Therefore, the above line of cases is distinguishable and not controlling of our review. Consequently, we hold that the principles of administrative collateral es-

toppel did not bar the trial court from establishing Larry's potential income.

## B. *The Amount of Potential Income*

■ Next, Larry argues that even if the trial court properly imputed income to him, the trial court erroneously calculated the amount of potential income without considering the factors enumerated by the guidelines. Specifically, Larry claims that the trial court did not consider his physical impairment, existing job opportunities, or work history in arriving at the amount of potential income.

The Guidelines require the trial court to calculate a spouse's potential income by "determining employment potential and probable earnings level based on the [spouse's] work history, occupational qualifications, prevailing job opportunities, and earnings level in the community...." Child Supp. G. 3(A)(3). Here, while the dissolution order reflects that the trial court did not specifically address Larry's physical limitations, the order demonstrates that the trial court considered Larry's prior work history and other factors in arriving at its final figure. First, the trial court considered both the maximum and minimum amounts of profit that the business could generate. For the maximum value, the trial court relied on the business' operating statement for the first quarter of 1994 and determined that the business was capable of generating a net profit of $400 per week. Then, the trial court calculated the minimum amount of profit that the business could generate based upon the weekly minimum wage of $174.00 per week. The trial court indicated that it would "choos[e] to remain within the extremes of calculation" and, thus, selected $300 per week as the amount that the Larry could net from the business. Record, p. 19.

■ We find that the trial court properly determined Larry's "employment potential and probable earnings level" by reviewing the tax returns and operating statements of the business. *See* Child Supp. G. 3(A)(3). Larry has owned the same business since 1973. Because the trial court set the amount of Larry's potential income based upon performance of the same duties which Larry had performed since 1973, the trial court did not need to specifically list Larry's previous work history and job qualifications. Moreover, Ryan testified that Larry assisted him with the painting and body work of the cars. Thus, the trial court merely considered the amount of income that Larry could generate doing the same tasks that he had done since 1973 and, according to Ryan's testimony, had continued to do presently. Therefore, we find that the trial court properly followed the guidelines in determining the amount of Larry's potential income.[3]

■ As a separate matter, Larry argues that the trial court improperly found that the business was "capable of generating net profit, ... in the order of $400.00 net per week, or approximately $20,000.00 per year." Record, p. 19. Larry claims that the trial court erroneously made this finding based upon the business' performance in the first quarter of 1994.[4] He maintains that the trial

---

3. In addition, Larry argues that the trial court improperly ordered him to pay more than 50% of his weekly gross income for child support in violation of the guidelines. The trial court ordered that Larry pay $325 per month in child support plus $75 per month for retroactive child support. Larry claims that this $400 payment exceeded fifty percent of his $693 monthly disability check in violation of Child Supp. G. 2 which provides in part, "[i]n no case shall child support ... exceed fifty percent (50%) of the obligor's weekly adjusted income." However, as previously discussed, the trial court properly imputed a weekly income to Larry based on his ownership of the business in an amount equal to $300 per week. As a result, the amount of support ordered by the trial court does not exceed fifty percent of Larry's weekly gross income.

4. In his brief, Larry asserts that the trial court should have sought an expert opinion before establishing the profitability of the business. However, Larry provided no authority to support his position and we find no such authority. Instead, we note that the child support guidelines authorize the trial court to review income financial records to ascertain a value of income for the self-employed spouse. Child Supp. G. 3, commentary; *see In Re Paternity of Thompson*, 604 N.E.2d 1254, 1256 (Ind.Ct.App.1992), *reh'g denied.* Similarly, we find that the trial court properly relied on financial documents, such as the operating statement, as a basis to support its calculation of the business' profitability. Moreover, we find such action necessary to ascertain a self-employed spouse's income in light of the possibility that a self-employed spouse has the opportunity to distort "the true picture of [the spouse's] income in the short term." *Smoot v.*

court erroneously assumed the business would earn the same amount of income each quarter. Instead, Larry relies on the 1993 quarterly results which greatly fluctuated between gains and losses to support his argument that "a 'snapshot' of one quarter is not an adequate basis for the prediction of earnings for a business that has experienced extreme earnings fluctuations from quarter to quarter." Appellant's brief, p. 29.

■ However, this argument is no more than a request to reweigh the evidence, which we may not do. *Ernst v. Ernst*, 503 N.E.2d 619, 621 (Ind.Ct.App.1987). It is within the trial court's sound discretion to weigh the evidence. *See id.* We will reverse only if the determination is against the logic and effect of the circumstances before the trial court. *See Cleary v. Cleary*, 582 N.E.2d 851, 852 (Ind.Ct.App.1991). During the dissolution proceedings, the parties presented conflicting evidence to the trial court concerning the profitability of the business. Sharon admitted into evidence without objection, an operating statement for the first quarter of 1994. This statement computed the quarterly net profit of the business at more than $8,300. Larry provided an operating statement for the entire year which indicated that the business lost $109.

Based upon the submission of the operating statement for 1994, we cannot say that the trial court's determination is against the logic and effect of the circumstances. In addition, since there was evidence before the trial court to support a finding that the business' profitability could exceed $33,000 ($8,300 × 4) for the year, the trial court's finding that the business' profitability was $20,000 was supported by the evidence. *See Ernst*, 503 N.E.2d at 621 (holding that the trial court did not abuse its discretion in valuing property at $759,450 because the evidence before the court supported a valuation of up to $767,314.) Therefore, the trial court did not abuse its discretion in valuing the profitability of the business. *See Cleary*, 582 N.E.2d at 852.

In sum, we find that the trial court acted within its discretion to establish an amount of potential income for Larry. Similarly, the trial court followed the guidelines in determining the amount of that potential income. Finally, we find that the trial court acted within its discretion when it valued the profitability of the business using the operating statements admitted into evidence.

## II.

■ The second issue for our review is whether the trial court was required to deduct the social security disability benefits that Larry's son receives from Larry's child support obligation. Larry's youngest son, Nathan, receives $178 each month from the SSA because of Larry's disability. Larry argues that as the disabled parent, he is entitled to have his child support obligation credited with the social security disability benefits received by Nathan. In support of this argument, Larry relies on our decision in *Poynter v. Poynter*, 590 N.E.2d 150 (Ind.Ct. App.1992), *reh'g denied, trans. denied.*

In *Poynter*, the trial court reduced the total amount of child support by $61.86, the amount of social security disability benefits the children received as a result of the wife's disability. The wife appealed, arguing that the trial court should not have reduced the total child support obligation by the children' disability benefits. Rather, the wife insisted that the court should have calculated the *total* child support irrespective of the children's disability benefits and then reduced *her* obligation by the amount of the children's benefits. The wife argued that as the source of the children's disability benefits, she should have received the credit for their payment and the husband should not have benefitted in that award by receiving a reduction of his support obligation. In *Poynter*, we concluded that the disabled parent is entitled to have child support obligations credited with the disability benefits received by the child because of that parent's disability. *Poynter*, 590 N.E.2d at 152–153.

*Smoot*, 604 N.E.2d 618, 624 (Ind.Ct.App.1992), *trans. denied; see McGinley–Ellis v. Ellis*, 638 N.E.2d 1249, 1252 (Ind.1994) (holding that "determining the profitability of the venture or oper-

ation paints a better picture of the spouse's financial wherewithal than would a mere toting up of any formal compensation or in-kind benefits.")

Very recently, however, our supreme court questioned the viability of *Poynter*'s seemingly bright line rule. *Stultz v. Stultz*, 659 N.E.2d 125, 128 (Ind.1995). In *Stultz*, the noncustodial parent appealed the trial court's refusal to offset his child support obligation by the amount of social security retirement benefits paid directly to the children as a result of his retirement. The trial court reasoned that the retirement benefits paid to the children "are not a means-tested public assistance that should be protected in any way from consideration in the fixing of the support obligation.... [S]uch benefits are made available to the children at no purchase cost to the retiree." *Stultz*, 659 N.E.2d at 127. Further, the trial court found that the benefits "became available, assuming a certain base level contribution by the retiree and his employer, no matter how many or how few children and they would not be available if there were no children" and that had the marriage not been dissolved, the children would have enjoyed the mother's income, all of the husband's income and retirement benefits plus the children's own retirement benefits. *Id.*

In reviewing this determination, we rejected the trial court's analysis and found that *Poynter* controlled the case. *Stultz v. Stultz*, 644 N.E.2d 589, 591–592 (Ind.Ct.App.1994), *vacated by*, 659 N.E.2d at 128. Based upon *Poynter*, we found no difference between social security disability and retirement benefits for purposes of determining whether to grant a credit to the retired parent equal to the amount of such benefits. *Id.* at 591. As a result, we reversed the trial court and held that the retired parent is entitled to a credit equal to the amount of those social security benefits received by the children as a matter of law. *Id.*

In vacating our opinion, the supreme court held that there is no automatic right to a credit. *Stultz*, 659 N.E.2d at 128. Instead, the supreme court found that the "presence of social security benefits [is] merely one factor for the trial court to consider in determining the child support obligation or modification of the obligation." *Id.*; *cf. Young v. Young*, 654 N.E.2d 880, 884 (Ind.Ct.App. 1995), *reh'g denied, trans. denied* (holding that social security survivor benefits paid to a child should be credited towards the parent's child support obligation.) Applying this standard, the supreme court found that the trial court properly considered all the factors in the case and concluded that a credit was not warranted. *Stultz* at 128. In addition, the supreme court estimated the impact of its holding on other cases:

> "Our holding today does not foreclose the possibility of other trial courts, in certain cases, granting a credit to a social security recipient parent for benefits received by a child. We anticipate, however, that such a credit will generally be denied, at least with respect to social security *retirement* benefits."

*Id.* at 128–129 (original emphasis).

Larry relies on the last statement in the above quoted standard to support his argument that *Stultz* was limited to social security retirement benefits and, therefore, that *Poynter* still controls social security disability benefit cases. In a footnote in *Stultz*, however, the supreme court considered its holding on future *disability* benefit cases:

> "We can envisage a social security disability recipient parent making a stronger case for a credit than a social security retirement recipient but decline to give that issue extensive treatment in this case involving only retirement benefits. Suffice it to say here that disability may affect the parent's and child's standard of living in dramatically different ways than retirement, giving rise to a stronger claim for a credit."

*Id.* at 129, n. 6. Based upon this footnote, we find that it is within the trial court's discretion to determine whether a credit for disability benefits is appropriate. In addition, while the supreme court chose not to give extensive treatment to the issue of disability benefits, it nonetheless clearly established that this issue should be resolved on a case-by-case basis.

Taking these principles as a whole, we find that it was within the trial court's discretion to give Larry a credit for the amount which Nathan receives each month and that the trial court was under no obligation to do so. Therefore, Larry's argument that the trial

court was required to reduce his support obligation by the amount of Nathan's disability benefits fails.

### III.

The third issue for our review is whether the trial court provided an adequate basis for its child support award. Larry argues that the trial court erroneously relied upon an unsigned and unverified child support worksheet as the basis for its support award in violation of the guidelines which provide in part:

> "1. ... A copy of the [child support] worksheet ... shall be completed and filed with the court in each case in which the court is asked to order support, ... and worksheets shall be signed by both parties, not their counsel, under penalty of perjury.
> 2. ... Income statements of the parents shall be verified with documentation of both current and past income. Suitable documentation of current earnings includes paystubs, employer statements, or receipts and expenses if self-employed. Documentation of income may be supplemented with copies of tax returns."

Child Supp. G. 3(B). When one spouse disputes the income claimed by the other spouse both parties should sign and submit separate worksheets showing their respective opinions of the proper child support calculation. *Id.* at commentary. We recently addressed the necessity for the trial court to provide a foundation for the trial court's calculation of the child support award:

> "In our review, we must start with the observation that our trial courts are required to make support orders in compliance with the guidelines and to spell out the reasons for any support orders which deviate from the guideline results. We cannot review a support order to determine if it complies with the guidelines un-

less the order reveals the basis for the amount awarded. Such revelation could be accomplished either by specific findings or by incorporation of a proper worksheet."

*Cobb v. Cobb,* 588 N.E.2d 571, 574 (Ind.Ct. App.1992).

Here, the trial court's order does not afford us a basis to review the support award. While we have determined that the trial court properly set a potential income for Larry based upon his ownership of the business and acted within its discretion when it calculated the amount of income at $300 per week,[5] we still cannot discern the basis for the final child support award.

First, we note that the trial court's findings do not provide the grounds for the award. Our own calculation of the child support amount under the guidelines follows. To ascertain Larry's total weekly gross income, we add the $300.00 of potential income from the business to the $160.00 of disability benefits,[6] for a total of $460.00. Sharon's weekly gross income totals $314.63. A combined weekly gross income for the parties is $774.63. Of this amount, Larry contributes 59% and Sharon contributes 41%. Turning to the guideline schedules, the weekly support payment for a couple with a combined weekly adjusted income of $774.00 and two children equals $188.00. *See* Child Supp. G. 6. Of this amount, Larry is responsible for 59% or approximately $111 per week, for a total monthly child support payment of approximately $481 per month.[7] Similarly, if we calculate Larry's support based upon a potential income equal to Sharon's income, then Larry's support obligation totals approximately $496 per month.

These amounts are clearly greater than the $325 award ordered by the trial court. In her brief, Sharon performs one calculation

5. The trial court set the amount of Larry's potential income from the business at "something in the order of $300 per week, or an amount roughly equal to Wife's wages...." Record, p. 19. This indeterminable amount of potential income only compounds the difficulty in discerning the basis of the trial court's order. However, we will begin our calculation with the $300 amount to demonstrate the basis for our reversal and then

continue with the $314.63 amount, the amount "roughly equal" to Sharon's wages.

6. We arrived at this amount by adjusting the $693.00 monthly benefit it to a weekly figure.

7. We arrived at this amount by multiplying the weekly figure of $111 by 52 and then dividing that total by 12.

of the child support award and achieves a figure similar to the ones above. Next, Sharon argues that because the trial court ordered an award of $325, the court obviously reduced Larry's award by the amount of Nathan's benefits. However, the trial court's findings do not indicate whether Nathan's benefits were deducted from Larry's obligation. Even if the trial court had credited Larry for Nathan's benefit of $178.00, our calculations total $303.00 or $318.00 a month. Because the trial court's findings do not indicate how the trial court arrived at its figure of $325, we cannot review the propriety of the trial court's $325.00 award.

Second, the trial court did not adopt the parties' child support worksheets. Sharon submitted two unsigned worksheets. One worksheet indicated that it was "based on tax return" and calculated Larry's support at $86.00. Record, p. 354. The other worksheet claimed to be based on the operating statement and calculated Larry's support at $180. Larry submitted one child support worksheet which indicated that Larry should pay no child support. Based upon the figures in these worksheets, it is clear that the trial court did not adopt either of the parties suggestions for support.

Because the trial court's order does not reveal the basis for the award either by specific findings or by incorporation of the parties' worksheets, we cannot review the support award to determine whether it complies with the guidelines. *See Cobb,* 588 N.E.2d at 574. Therefore, we remand this cause to the trial court with instructions to provide a basis for its child support award.

## IV.

The fourth issue for our review is whether the trial court failed to make a just and reasonable distribution of the marital property. Larry essentially raises two arguments to support his conclusion that the trial court did not make a just and reasonable distribution. First, he argues that the trial court inflated the value of the business and found that it exceeded the value of the marital home. This issue is further broken down into two parts which are whether the trial court erroneously added an income compo-

nent to the appraisal for the business and whether the trial court erroneously attributed Ryan's vehicles to the total business inventory. Second, Larry argues that the trial court erroneously excluded Sharon's inheritance from the marital pot.

The distribution of marital property during a dissolution proceeding is governed by I.C. § 31–1–11.5–11. When dividing the marital property, the trial court shall presume that an equal division of the marital estate is just and reasonable. I.C. § 31–1–11.5–11(c); *Kirkman v. Kirkman,* 555 N.E.2d 1293, 1294 (Ind.1990). However, this presumption may be rebutted by a party who establishes that an equal division would not be just and reasonable. I.C. § 31–1–11.5–11(c). The party must provide relevant evidence as to:

"(1) The contribution of each spouse to the acquisition of the property, regardless of whether the contribution was income producing.

(2) The extent to which the property was acquired by each spouse prior to the marriage or through inheritance or gift.

(3) The economic circumstances of each spouse at the time the disposition of the property is to become effective, . . . . .

(4) The conduct of the parties during the marriage as related to the disposition or dissipation of their property.

(5) The earnings or earning ability of the parties as related to a final division of property and final determination of the property rights of the parties."

I.C. § 31–1–11.5–11(c)(1–5).

If the trial court orders an unequal distribution, it must set forth the basis for the deviation from the 50–50 presumption. *See Euler v. Euler,* 537 N.E.2d 554, 556 (Ind.Ct.App.1989). We apply an abuse of discretion standard when reviewing the property distribution. *In re Sloss,* 526 N.E.2d 1036, 1038 (Ind.Ct.App.1988). In reviewing distributions, we neither reweigh the evidence nor judge the credibility of the witnesses. *Olds v. Olds,* 531 N.E.2d 1219, 1221 (Ind.Ct.App.1988). Rather, we consider only the evidence most favorable to the trial court's disposition. *Id.* We will reverse only where the trial court's decision is clearly

against the logic and effect of the facts and circumstances before the court, including the reasonable inferences to be drawn therefrom. *Berger v. Berger,* 648 N.E.2d 378, 381 (Ind. Ct.App.1995). The party challenging the trial court's distribution must overcome a strong presumption that the court complied with the statute. *DeHaan,* 572 N.E.2d at 1325.

### A. *The Valuation of the Business*

Before dividing the marital property, the trial court had to first assign a value to the business. This value differed from the calculation of profitability, which the trial court used to determine the child support award. In its findings of fact, the trial court stated in part:

> "Appraisals of the real estate admitted into evidence varied, that for the Wife being $85,000.00 and that for the Husband being $53,000.00 ... the Court finds the Husband's appraisal by Jim Meyers the more persuasive of the two appraisals....

> \*   \*   \*   \*   \*   \*

> The parties concentrated much of their business issue attention on the value and ownership of the business real estate (addressed above) and the value of the inventory of used cars at the business at the time of filing. The Wife, using the year-end figures reported on the 1993 tax return, contends that the Court should find the value of the date-of-filing inventory to be 13,925.00. The Husband, on the other hand, tendered his inventory of the vehicles actually on the lot on March 16, 1994, the date of filing, establishing the value of the inventory at $16,670.00, including retail value of the 1988 Oldsmobile driven daily by Wife. However, he attributes four of the ten vehicles there at the time, valued at $7,525.00, to Ryan. Ryan identified ... [several] vehicles that he had purchased ... for his own use or resale, but did not testify as to ownership of any vehicles at Scott Sales & Service on March 16, 1994. The Court finds the March 16, 1994, inventory to be considered in the division of the marital estate to be $16,670.00, including

the retail value of the 1988 Oldsmobile which has been used by the Wife for some unspecified period of time as her primary daily means of transportation. Whatever the resolution of this issue, the business inventory is part and parcel of the Husband's business endeavors and part of the marital estate only to the extent of the valuation of the business, with the exception of the 1988 Oldsmobile.

> While there were appraisals of the business real estate, there were no appraisals of the complete business, apparently due to the assumption that there was no significant net income resulting from its operations. As the value of the real estate is $53,500.00, the value of the inventory at the time of filing was $12,870.00 (total inventory less the listed retail value of the 1988 Oldsmobile), and the finding that the net business income of $15,000.00 per year, the Court concludes that the value of the business was a minimum of $66,370.00, exclusive of good will and income-generation potential. While Court is not able to make a precise finding concerning that valuation, it finds that the value of the business is greater than the value of the former marital residence."

Record, pp. 17, 19–20.

Larry argues that the trial court improperly inflated the value of the business to exceed that of the marital home.[8] Larry raises two specific challenges to the trial court's valuation of the business. First, he argues that the trial court improperly attributed an income component to the value of the business despite the fact that the appraisal already included an income component. Second, he argues that the trial court improperly included the value of the vehicles owned by Ryan in assessing the total value of the business' inventory. We will address each challenge in turn.

▪ Initially, Larry argues that the business appraisal included an income component and, therefore, that the trial court erroneously "counted the income component twice by adding its own estimation of 'potential' *annual* income to the [appraisal]." Appellant's

---

8. An appraiser valued the marital home at $75,000.00.

brief, p. 36 (original emphasis). Larry cites our opinion in *Annon II, Inc. v. Rill*, 597 N.E.2d 320 (Ind.Ct.App.1992), *reh'g denied*, *trans. dismissed*, in support of his argument that the trial court may not attribute income potential to the value of the business when the appraisal already includes an income component. However, while *Annon* addressed the methods used for determining the fair market value of a business, *Annon* is distinguishable. In that case, the issue related to damages for breach of a contract to sell a hotel was whether evidence of projected lost profits was relevant to establishing the fair market value of a hotel. We, after noting that the appellant had waived any objection by having introduced similar evidence for the same purpose, held such evidence relevant "not as anticipated lost profits as such, but rather as going to the fair market value of [the hotel] on the date of the breach." *Id.* at 328. The profit producing power of the hotel was relevant to determining the hotel's value under the net income capitalization method of determining value.

Here, however, the net income capitalization approach was used to value the real property (land and building) of Scott Sales & Service and not to value the business' operations, "apparently due to the assumption that there was no significant net income resulting from its operations." Record, p. 20. The income used to value the real estate in the appraisal was an economic rent developed from a consideration of other comparable properties. Because the appraisal did not consider income that the business could generate from its operation, Larry's argument that the trial court erroneously added the income potential is unpersuasive. As such, we find that the trial court did not err by attributing an income potential component to the total value of the business.

▮ Next, Larry argues that the trial court erroneously included Ryan's personal property in the calculation of the inventory's value, which was added to the appraised value of $53,500.00 and the income component of $15,000.00. Larry relies on two inventory lists which were submitted into evidence without objection. These lists proposed that on March 16, 1994, the date

that the petition for dissolution was filed, Larry owned six automobiles totaling $9,145.00 and Ryan owned four automobiles totaling $7,525.00. Despite the list attributing several of the vehicles to Ryan, the trial court included all ten vehicles in the business' inventory. The trial court added the values of both inventory lists for a total of $16,670.00. To this value, the trial court subtracted $3,800.00, the value of an 1988 Oldsmobile that Sharon used as her primary mode of transportation. The trial court added the remaining $12,870.00 to the value of the business.

Larry argues that the trial court acted contrary to law when it ignored his inventory list. He argues that the only other evidence admitted at trial with respect to this issue was Sharon's inventory list which detailed the inventory of the business in January of 1994, several months prior to the filing of the petition for dissolution. This list described six of the ten vehicles included on Larry's list although different monetary values were assigned to the vehicles. In addition, Larry argues that Sharon did not dispute his contention that the inventory described in the list belonged to Ryan. Again, however, this argument is a request to reweigh the evidence, which we may not do. *See Olds*, 531 N.E.2d at 1221. Instead, we must consider the evidence most favorable to the trial court's distribution. *Id.*

Viewing the facts in the record most favorable to the distribution, we find that the trial court acted within its discretion in calculating the value of the inventory. During Larry's direct examination, he testified that several of the vehicles belonged to Ryan. In addition, Larry indicated that Ryan would testify that he owned the vehicles. Larry admitted into evidence the inventory lists detailing those cars which he owned and those cars which Ryan owned on March 16, 1994. However, as the trial court indicated in its findings, while Ryan testified that he had purchased several automobiles for his own use or resale, Ryan did not testify that he owned any of the vehicles on the March 16, 1994, inventory lists. As a result, the trial court included the entire value of the inventory on both lists and subtracted the cost of the car

that Sharon used to establish a final inventory value for the business. We find that the trial court acted within its discretion when it inferred that the vehicles on both lists constituted the total inventory of the business because Ryan failed to testify that he owned any of the vehicles on the March 16, 1994, inventory lists. Therefore, the trial court's determination is not clearly against the logic and effect of the circumstances before the court. *See Berger,* 648 N.E.2d at 382.

### B. *The Inheritance*

■ Next, Larry argues that the trial court improperly excluded Sharon's inheritance from the marital pot. Sharon used the money she inherited to purchase a certificate of deposit worth $11,172.00. Larry concedes that the property which Sharon acquired through gift or inheritance could justify an unequal distribution in accordance with I.C. § 31–1–11.5–11(c)(2). However, he argues that "an unequal distribution favoring Sharon would not be justified by the inheritance from her mother since throughout the marriage the parties and their children received substantially more from Larry's parents than from Sharon's." Appellant's brief, p. 39. Larry claims that the trial court's finding that his parents' gifts should be divided equally but that Sharon's mother's gift should be excluded is not just and reasonable.

■ Ind. Code § 31–1–11.5–11(b) requires the court to "divide the property of the parties...." Therefore, all of the property owned by the parties, including property acquired by inheritance, shall be included in the marital pot and placed within the trial court's authority to divide the assets. *Castaneda v. Castaneda,* 615 N.E.2d 467, 469 (Ind.Ct.App.1993). Nothing in this rule, however, requires the court to distribute an asset acquired through inheritance equally between the parties. In fact, I.C. § 31–1–11.5–11(c) clearly authorizes the trial court to order an unequal division of those assets which were acquired through inheritance or gift. As such, while the trial court must

include the inheritance in the marital pot, the trial court has the discretion to set over the inheritance to one spouse.

In its order, the trial court explained that:

"[T]he Wife apparently had a bank account in her own name with a balance of about $400.00 at the time of filing, a vested pension through her employment valued at $5,573.86, and a certificate of deposit funded by a small inheritance from her mother (the Court notes that the date of inheritance was not disclosed by the evidence and that the Husband has made no claim against these proceeds) which had a value of $11,172 and which has apparently been held be [sic] her separately and apart from all other marital assets.

\* \* \* \* \* \*

The Court finds that the Wife's certificate of deposit should be set aside and awarded to her and that the remainder of the marital [property] should be divided in roughly equal shares, taking into consideration the Court's finding that the value of the business exceeds the value of the former marital residence by some imprecise amount."

Record, p. 20. Based upon the last statement, we find that the trial court included the inheritance in the marital pot but awarded it to Sharon. The trial court indicated that the inheritance should be awarded to Sharon and that the "remainder" of the marital property should be divided equally. The use of the term "remainder" demonstrates that the trial court considered the inheritance a marital asset and that it set that asset over to one party. This action is within the trial court's discretion. *See* I.C. § 31–1–11.5–11(c). The only remaining issue is whether the resulting unequal distribution in Sharon's favor is just and reasonable.

Taking the evidence most favorable to the judgment and accepting those values provided in the trial court's order, the final property distribution is as follows:

| Sharon | | Larry | |
|---|---|---|---|
| marital house: | $75,000.00 | business real estate: | $53,500.00 |
| individual checking account | 400.00 | inventory: | 12,870.00 |
| interest in pension: | 5,573.86 | potential income: | 15,000.00 |
| cert. of deposit: | 11,172.00 | business bank acc't: | 3,381.36 |
| 1988 Oldsmobile | 3,800.00 | | |
| TOTAL | $95,945.86 | | $84,751.36 |

Thus, the effect of the decree was to award approximately forty-seven percent of the marital property to Larry and fifty-three percent to Sharon. This six percent difference is approximately equal to the value of the inheritance. In support of the unequal distribution, the trial court indicated that Sharon held the inheritance separate from the other marital assets and that Larry did not contribute to the accumulation of the asset. There was no evidence to suggest that the inheritance was used to pay marital expenses at any time. These factors are sufficient to support the trial court's decision to award Sharon the inheritance and order an unequal division of assets. *See Castaneda*, 615 N.E.2d at 470–471. Therefore, the decree provides for a just and reasonable distribution, and the trial court did not err.

## V.

The final issue for our review is whether the trial court abused its discretion by ordering Larry to pay part of Sharon's attorneys fees. Larry claims that Sharon has a higher monthly income than he does and, therefore, that the award of partial attorney fees to Sharon constituted an abuse of discretion.

Ind. Code § 31–1–22.5–16 authorizes the trial court to "order a party to pay a reasonable amount for the cost to the other party of maintaining or defending any proceeding under this chapter and for attorney's fees...." The trial court has broad discretion in awarding attorney fees, and we will not disturb such an award absent an abuse of that discretion. *Cavazzi v. Cavazzi*, 597 N.E.2d 1289, 1294 (Ind.Ct.App.1992). When making an award of attorney fees in a marriage dissolution case, the trial court must consider the resources of the parties, their economic condition, the ability of the parties to engage in gainful employment and to earn adequate income, and such other factors that

bear on the reasonableness of the award. *In re Lewis*, 638 N.E.2d 859, 861 (Ind.Ct.App. 1994).

The evidence established that Sharon had $2,351.66 in attorney fees plus costs and that Larry accumulated $2,717.00 in attorney fees plus costs. The trial court ordered Larry to contribute $1,250.00 to Sharon's litigation expenses explaining that because Larry "has not been forthcoming with respect to his earnings from the business, the Court finds the preponderance of the equities to be with the Wife...." Record, p. 21.

Based upon the trial court's finding that Larry had a potential income of $300.00 per week in addition to his $693.00 monthly disability payment, Larry has a higher monthly income than Sharon. This disparity between the parties' incomes is sufficient to support the award of partial attorney fees. *See Olds*, 531 N.E.2d at 1221. In addition, the trial court found that Larry did not provide credible evidence as to earning capacity. In light of Larry's capacity to earn adequate income and the fact that he was not "forthcoming" with respect to his earnings, we cannot say that the trial court abused its discretion in ordering Larry to pay partial attorney fees to Sharon. *See Cavazzi*, 597 N.E.2d at 1294.

### Conclusion

In sum, we affirm the trial court's determination of Larry's potential income. Further, we find that the trial court may deduct the social security disability benefits that Larry's youngest son receives from the total amount of Larry's child support obligation, but that the trial court is not required to do so. In addition, we affirm the distribution of the marital property. Finally, we find the trial court did not err in awarding Sharon partial attorney fees. We remand this cause, however, for the trial court to provide a basis for its final child support award.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.

KIRSCH, J., concurs.

GARRARD, J., concurs with separate opinion.

GARRARD, Judge, concurring.

I concur with parts II, III and IV of the majority opinion. I also concur in the result as to part I of the opinion because I believe the court's discussion of potential or imputed income and the Child Support Guidelines related thereto is beside the point. The trial court did not find that Larry was underemployed and might reasonably make $300 per week from his auto business. The court expressly determined that Larry's testimony on the subject was not credible, and the court expressly found that Larry was in fact earning about $300 per week from the business.

Thus, the available question (one which appellant leaves unargued) is whether the evidence was sufficient to sustain the court's determination. Under the facts, as discussed by the majority, it was. And in any event, the issue is unavailable since Larry elected not to argue it on appeal. I therefore concur with the majority's conclusion that no error was committed.