ANNON II, INC., Merchants National Corporation, and Merchants National Bank & Trust Company of Indianapolis, Appellants–Defendants,

v.

Eric RILL, Appellee–Plaintiff.

No. 49A02–9111–CV–535 [1].

Court of Appeals of Indiana, First District.

Aug. 6, 1992.

Rehearing Denied Sept. 10, 1992.

Transfer Dismissed Sept. 22, 1992.

1. This case was transferred to this office by order of the Chief Judge on June 15, 1992.

David C. Campbell, Karl L. Mulvaney, Nana Quay–Smith, Douglas E. Cressler, Bingham Summers Welsh & Spilman, Indianapolis, for appellants-defendants.

Henry J. Price, Jerry Garau, Price & Barker, Indianapolis, for appellee-plaintiff.

RATLIFF, Chief Judge.

## STATEMENT OF THE CASE

Annon II, Inc., Merchants National Corporation, and Merchants National Bank & Trust Company of Indianapolis ("Merchants") appeal from a judgment in favor of Eric Rill in an action for breach of a contract in the sale of real estate and an award of $3,585,000 compensatory damages and $2,000,000 punitive damages. We affirm in part, reverse in part, and remand.

## ISSUES

We consolidate and restate the issues as follows:

1. Did the trial court err in denying Merchants' motion for change of venue, when the motion was filed more than ten days after the issues were closed on the merits?

2. Did the trial court err in admitting evidence of: Rill's calculated lost operating income, also referred to as lost profits, over a period of five years; the expected value of Midway Motor Lodge ("Midway") upon resale; and, Rill's prior hotel sales, when Merchants stipulated to the admission of various exhibits and similar evidence was admitted by Merchants' experts in calculating Midway's fair market value?

3. Was the jury's award of punitive damages supported by clear and convincing evidence?

**2.** Rill purchased distressed hotels, renovated them, improved their management, and then

## FACTS

In 1984 and 1985, Midway began experiencing difficulty repaying a $7,000,000 construction loan that it had obtained from Merchants. Midway eventually was turned over to Merchants in 1986. Merchants immediately began making arrangements to sell Midway. Merchants hired a management group to run Midway and had it appraised. The Rooney Group stated in its appraisal done at Merchants request that Midway had a market value of $11,000,000. Record at 2362 and 2368. A report by Valuation Counselors Center, Inc. indicated a fair market value of $5,100,000. Record at 2370. In January 1987, Rill became aware that Midway was for sale. Rill, a former president of the Ramada Hotel Company, was a "turnaround specialist"[2] in the hotel business.

Rill came to Indianapolis in January of 1987, where he met with Chris Heath, an officer of Merchants, to discuss purchasing Midway. On March 3, 1987, Sunbelt, the ultimate purchaser of Midway, made an offer to purchase Midway for $4,100,000. The following day, Rill submitted an offer in the amount of $3,600,000. On March 25, 1987, Bruce Wooldridge, a bank officer at Merchants, met with Sunbelt's representatives. Wooldridge and Sunbelt signed a handwritten term sheet indicating a purchase price of $4,150,000. During the meeting, Heath privately informed Wooldridge that Rill had telephoned with a higher offer. Rill offered to purchase Midway for $4,300,000. That afternoon Heath and Wooldridge telephoned Rill. Pursuant to the telephone conversation, Wooldridge had a proposal typed, signed it on behalf of Merchants, and sent it to Rill for his signature. Record at 3279. Rill signed the proposal upon receipt. Wooldridge took both Sunbelt's agreement and Rill's agreement to Merchants' loan committee for approval. Both loans were approved. Record at 3285–88.

On April 3, 1987, Rill telephoned Merchants to schedule a meeting in Indianapo-

resold the hotels at a profit.

lis and was told by Heath that they had a deal. Record at 2262–63. On April 6, Wooldridge met with a representative from Sunbelt and explained that Sunbelt's proposal would be considered a "backup offer." Record at 3288–90. Sunbelt's representative, Mubarek Amarsi, told Wooldridge that Sunbelt believed that a deal was in place, and Sunbelt would seek legal action. Later in the afternoon on April 6, Heath and Wooldridge met with Rill. Wooldridge and Rill discussed a "Purchase and Sale Agreement" that Rill's attorney had prepared. At the conclusion of the meeting, Wooldridge told Rill he was looking forward to closing. Record at 2266.

After the meeting with Rill, Wooldridge decided to reopen negotiations with Sunbelt for Midway's purchase. Record at 3298–99. Sunbelt increased its offer to $4,305,000. On April 8, 1987, Rill telephoned Heath and was told that Merchants was still working on the documents. Record at 2267. Later that same day, Heath sent Rill a letter which stated that "management does not feel it would be in its best interest to further negotiate the contract." Record at 2513. At no time did Merchants advise Rill that there was another interested buyer or proposal being considered. Record at 2263–65.

On April 27, 1987, Rill filed his complaint against Merchants, contending that it had breached a contract with Rill for the sale of Midway. Record at 37. Prior to trial, Merchants stipulated that the March 25, 1987 proposal created an enforceable contract between it and Rill. Record at 874. Merchants further admitted that its failure to close the transaction and convey Midway to Rill resulted in a breach of contract. *Id.* Hence, the case was tried on the issue of damages only. The jury awarded Rill compensatory damages in the amount of $3,585,000 and punitive damages in the amount of $2,000,000. Merchants appeals. Additional facts will be stated in our discussion of the issues.

## DISCUSSION AND DECISION

■ On appeal, a general judgment will be sustained upon any theory consist-

ent with the evidence. *Picadilly v. Colvin* (1988), Ind., 519 N.E.2d 1217, 1218–1219. We will neither reweigh the evidence nor judge the witnesses' credibility, but consider only the evidence most favorable to the judgment along with all reasonable inferences to be drawn therefrom. *Parke County v. Ropak, Inc.* (1988), Ind.App., 526 N.E.2d 732, 738, *trans. denied.* We decide whether there is substantial evidence of probative value supporting the trial court's judgment. *Id.* Only where there is a total failure of evidence or where the jury's verdict is contrary to the uncontradicted evidence will it be reversed. *Terre Haute Regional Hospital, Inc. v. El–Issa* (1984), Ind.App., 470 N.E.2d 1371, 1378, *trans. denied.* Thus, Merchants labors under a heavy burden in asserting error.

*Issue One*

■ Merchants argues that the trial court erroneously denied its motion for change of venue pursuant to Ind.Trial Rule 76, and thus, the trial court lacked jurisdiction over this case. We disagree.

In 1987, the rule provided in pertinent part:

"(1) In all civil actions, except those to enforce a statute defining an infraction, where the venue may now be changed from the judge or the county, such change shall be granted upon the filing of an unverified application or motion without specifically stating the ground therefor by a party or his attorney. Provided, however, a party shall be entitled to only one [1] change from the county and only one [1] change from the judge....

(2) In any action except criminal *no change of judge or change of venue from the county shall be granted except within the the time herein provided.* Any application for a change of judge or change of venue *shall be filed not later than ten [10] days after the issues are first closed on the merits.*"

T.R. 76(1) and (2) (emphases added). As a general proposition, at the time involved here, the duty to grant a change of venue

was mandatory upon the trial judge, as long as the motion was filed within the time limits prescribed by T.R. 76(2).[3] *State ex rel. First Bank of Whiting v. Porter Superior Court* (1983), Ind., 447 N.E.2d 568, 569; *City of Fort Wayne v. State ex rel. Hoagland* (1976), 168 Ind.App. 262, 265, 342 N.E.2d 865, 867–68. Merchants is correct in its assertion that if it had filed a timely motion for change of venue, the trial court would have been required to grant the motion. However, Merchants' calculation of the prescribed time period in which it had to file its motion for change of venue is erroneous.

▪ The issues were first closed on the merits in this case on June 22, 1987, when Sunbelt[4] filed its answer. *See Matter of Estate of Niemiec* (1982), Ind.App., 435 N.E.2d 999, 1001, n. 2 (in determining if change of venue motion is timely, it is original complaint and original answer which trigger time limitations in T.R. 76). The ten (10) days in which to file a motion for change of venue lapsed on Thursday, July 2, 1987; however, Merchants' motion was not filed until Monday, July 6, 1987. Hence, Merchants' change of venue motion was untimely.

Merchants argues that it is entitled under Ind.Trial Rule 6(E) to the benefit of three (3) additional days for mail service; and therefore, since day thirteen (13) fell on Sunday, July 5, it had until Monday, July 6 to file a timely motion. *See* T.R. 6(A) (filing due on the weekend is carried to next day the clerk's office is open). Merchants' reliance on T.R. 6(E) to extend the prescribed time period for filing its change of venue motion is misplaced. T.R. 6(E) states:

"Whenever a party has a right or is required to do some act or take some proceedings within a prescribed period *after the service of a notice or other paper upon him* and the notice or paper is served upon him by mail, three [3] days shall be added to the prescribed period."

As Rill points out, the three day extension provision of T.R. 6(E) only applies when a party has a right or is required to do some act within a prescribed period "after the service of a notice" upon the party. T.R. 6(E). *See, e.g.,* Ind.Trial Rule 6(C) (responsive pleading required to be served "within 20 days *after the service* of the prior pleading"); Ind.Trial Rule 33(C) (responses to interrogatories due "not less than thirty (30) days *after service* thereof"); Ind.Trial Rule 56(C) (adverse party has "thirty days *after service* of the motion to serve a response and any opposing affidavits").

The prescribed time for T.R. 76(2), however, does not commence running "after the service of a notice or other paper" upon a party. Rather, a party must file a motion for change of venue "not later than ten [10] days after the issues are first closed on the merits," not within ten days of the service of an answer. *See* T.R. 76(2). It is the filing of the answer which triggers the running of the ten day rule and not notice thereof.

Merchants further contends that the applicability of T.R. 6(E) to T.R. 76 has already been established in *State ex rel. Sargent & Lundy v. Vigo Superior Court* (1973), 260 Ind. 472, 296 N.E.2d 785. We disagree. In *Sargent & Lundy*, the trial court granted the relator's motion for change of venue; however, actual notice of the ruling was not given to the relator. The relator learned about the ruling from a codefendant who received a postal card postmarked December 11, 1972. *Id.* at 473–74, 296 N.E.2d at 786–787. The court determined that the commencement of the time in which the relator had to strike, pursuant to T.R. 76(9), began running on

---

3. Our supreme court amended Ind.Trial Rule 76 in 1991. A party is no longer entitled to an automatic change of venue upon filing a timely motion; rather, the rule now provides that in all civil actions a change of venue from the county "... shall be granted only upon a showing that the county where the suit is pending is a party or that the party seeking the change will be unlikely to receive a fair trial on account of local prejudice or bias regarding a party or the claim or defense presented by a party." T.R. 76(A).

4. Sunbelt originally was a defendant in this case; however, it is not participating in the appeal.

December 11; and, thus, the trial court's resumption of jurisdiction on December 18, 1972 for failure to strike was premature. *Id.* Any reference to the three (3) day rule of T.R. 6(E) was merely a gratuitous remark, since the trial court found that Sargent & Lundy had until December 24 to strike the names of the counties in which the case could be tried; therefore, the trial court's resumption of jurisdiction on December 18 was premature. Moreover, *Sargent & Lundy* addresses T.R. 76(9), not T.R. 76(2).

■ We conclude that T.R. 6(E) does not extend the prescribed time limit for filing a change of venue motion under T.R. 76(2). Merchants had only ten days from the time the issues were first closed on the merits to motion for change of venue. *See* T.R. 76(2); *see also Teegarden v. Sattison* (1980), Ind.App., 404 N.E.2d 1163, 1164 (defendant's motion for change of venue filed within ten days of answer was timely). The trial court properly denied Merchants' motion for change of venue since it was untimely.

*Issue Two*

■ Merchants asserts that the proper measure of damages in a breach of contract action is the difference between the fair market value of the property at the time of the breach and the contract price. Therefore, Merchants argues that the trial court erred when it concluded that Rill could introduce evidence of lost profits and other special damages to the extent that such damages were within the contemplation of both parties. Record at 1046. Rill counters that Merchants has waived any argument regarding the admissibility of evidence of lost profits by failing to object to the admission of numerous exhibits or the testimony of Rill's expert witnesses.

■ Any error in the admission of evidence is harmless if the same or similar evidence is admitted without objection. *Matter of Estate of Palamara* (1987), Ind. App., 513 N.E.2d 1223, 1231–32; *K.B. v. S.B.* (1981), Ind.App., 415 N.E.2d 749, 754. As we have explained previously:

" 'A party who permits incompetent evidence on a material issue to be introduced without objection cannot be heard to say on appeal that it should not be considered in determining if the finding is supported by the evidence. Its probative value, when so admitted is for the court or jury to determine, notwithstanding such evidence may have been excluded if proper and timely objection had been made.' "

*Chicago District Electric Generating Corp. v. Evans* (1946), 117 Ind.App. 280, 288, 69 N.E.2d 627, 630–31, *trans. denied, quoting Klingler v. Ottinger* (1939), 216 Ind. 9, 17, 22 N.E.2d 805, 809.

During Rill's testimony regarding Midway's projected value and sale at the end of five years, Merchants objected "to any testimony concerning any sale at the end of five years" and to testimony of lost profits. Record at 2287–89. The trial court sustained both objections on the basis that there had been no foundation laid. Record at 2287 and 2289. In the second objection, Merchants stated that it wished to continue its objection and suggested in part that lost profit damages were too speculative. Record at 2289. After a bench conference, the direct examination of Rill continued. Thereafter, Merchants asked the Court if it was showing a continuing objection "on this testimony," Record at 2290–91, to which the court replied that it would allow Merchants a continuing objection "to all evidence offered on the part of the Plaintiff as to the value of, [sic] of the future value of the property." Record at 2291. Merchants also objected to Rill's testimony regarding the sale of Rill's four other hotels as being too remote in time, speculative, and without adequate foundation. Record at 2109–10. The court overruled Merchants' objection but noted Merchants' continuing objection "to all testimony relating to [ ] prior [ ] purchases and sales of these four hotels." Record at 2111.

Rill argues that Merchants' failure to object specifically to the subsequent testimony of Rill's expert witnesses on the grounds that evidence of lost profits was inadmissibly speculative, waived Merchants' objection on appeal. Merchants

counters that such an objection was unnecessary because the trial court granted a continuing objection to "all evidence offered on the part of the plaintiff as to ... future value of the property." Record at 2291. Merchants' contention is extremely broad. However, even if we were to assume *arguendo* that Merchants' objection covered all evidence of lost profits, and not just Rill's testimony, we would still be compelled to find that Merchants waived any argument that the trial court erred in admitting evidence of lost profits, past hotel sales, or the future resale of Midway, since Merchants itself stipulated to the admission of various exhibits regarding Rill's lost profit calculations and past hotel sales. *See Evans*, 117 Ind.App. at 228, 69 N.E.2d at 630–31.

At trial, Plaintiff's Exhibits Numbers 1, 12, 17, and 18 were admitted by stipulation and without any objection by Merchants. Record at 2028. Exhibit 1 is a chart of Rill's prior hotel sales which illustrates the hotels' purchase prices, improvements made by Rill, and the hotels' eventual sales prices. Record at 2029. Exhibit 12 is Rill's "pro forma," which depicts Rill's expected profits from operating Midway over a five year period. Record at 2034. Exhibit 17 is entitled "CALCULATION OF ERIC RILL'S LOST PROFITS SUMMARY." Record at 2048. Exhibit 18 is a detailed calculation of Rill's lost profits over a five year period. Record at 2050. By failing to object at trial to the admission of these exhibits, Merchants cannot now claim it was prejudiced by the admission of testimony regarding Rill's lost profits, the expected resale of Midway, or the prior sales of Rill's four other hotels. Merchants has waived its argument that the trial court erred in admitting evidence of lost profits.

In addition, evidence of future profits is relevant, but only in so far as it applies to the value of Midway on the date of the breach. As Merchants correctly points out, the general measure of damages for a seller's failure or refusal to convey land is usually based on the difference between the contract price and the fair market value of the land at the time of the breach, plus the return of any payment made with interest. *See Arlington State Bank v. Colvin* (1989), Ind.App., 545 N.E.2d 572, 575, *trans. denied; Goodwine v. Kelley et al.* (1904), 33 Ind.App. 57, 61–62, 70 N.E. 832, 834; *see also Stoneburner v. Fletcher* (1980), Ind.App., 408 N.E.2d 545, 551 (customary measure of damages as difference between contract price and market value found inapplicable because difference between contract price and market price was zero); *Farmers' & Citizens' Building, Loan & Savings Association v. Rector* (1899), 22 Ind.App. 101, 102–103, 53 N.E. 297, 298 (difference between contract price and fair market value is measure of damages for purchaser's breach of contract); *but see Large v. Gregory* (1981), Ind.App., 417 N.E.2d 1160, 1163–64 (suggests that Indiana follows the English rule of contract damages, namely, that only if bad faith shown will buyer recover difference between contract price and market value; however, recognizes cases to the contrary and never directly decides whether English rule or American rule was applicable because damages sought by buyer were not compensable). This measure is referred to as the loss of the bargain. *Arlington*, 545 N.E.2d at 576. It is the fair market value at the time of the breach that is controlling. *Id.*

Fair market value of the property is the price at which it would change hands between a willing buyer and seller, neither being under any compulsion to consummate the sale. *Ohio Casualty Insurance Co. v. Ramsey* (1982), Ind.App., 439 N.E.2d 1162, 1167, *trans. denied.* In *Ohio Casualty*, we set out three well recognized methods of determining a property's fair market value taken by eminent domain:

"(1) the current *cost of reproducing* the property less depreciation from all sources; (2) the *'market data'* approach or value indicated by recent sales of comparable properties in the market, and (3) the *'income-approach,'* or the value which the property's net earning power will support based upon the capitalization of net income. This three-approach means of reaching market value is usual-

ly combined. It is stated in American Institute of Real Estate Appraisers. 'The Appraisal of Real Estates' (3d ed.) at page 66: ' * * * In the majority of his assignments, the appraiser utilizes all three approaches. *On occasion he may believe the value indication from one approach will be more significant than from the other two,* yet he will use all three as a check against each to test his own judgment.' All three methods have been judicially approved."

*Id.* (emphases in original). In the appraisal of real estate, any one or all three of these approaches to estimate the fair market value may be applied. *Id.* Evidence of all three approaches, cost, market, and income capitalization, was introduced to determine the fair market value of Midway. Record at 2354–2362; 2390–2412; and, 2525–2649. We find that all three approaches were important in determining Midway's value and ultimately arriving at a compensatory damages award.

 Rill's procedure for determining his lost profits was the same methodology used to determine Midway's value under the income capitalization approach. Rill prepared a pro forma on March 25, 1987, prior to contracting to purchase Midway. Record at 2242 and 2288. The pro forma, Plaintiff's Exhibit Number 12, was a projection of Midway's income over a five year period and the potential profit to be realized from a resale of Midway at the end of the period. Record at 2034–35; 2240–42; 2245–53; and, 2290–93. Rill then applied a ten percent capitalization rate and determined that Midway would have a value at the end of the fifth year of $15,600,000, less $5,500,000 purchase price and renovations of Midway. Record at 2290–2294. This value was referred to as Rill's lost profits. James Aldering, a certified public accountant ("C.P.A.") with experience in business valuation, reviewed Rill's projec-

tions and used the pro forma to arrive at a valuation of Midway. Aldering took Rill's income projections over the five year period and a projection of the profit from a future resale, and discounted the projections to present value to arrive at an amount of damages. Record at 3189–3210. Aldering determined this figure to be $13,172,195. Record at 2048 and 3205. Although Aldering referred to his calculation as lost profits, in all actuality his calculations were simply a determination of Midway's fair market value using the income capitalization approach of valuation. Likewise, Philip Moore,[5] Rill's other expert witness, used the same method to determine Midway's fair market value under the income capitalization approach. Record at 2906–21; 3129; and, 3140–63. Under the income capitalization approach Moore determined that in 1987, Midway had a fair market value of between $8,570,000 and $13,130,000. Record at 3166. Moore also determined Midway's value under the cost and market approaches. Record at 3166.

Rill's damages calculations were based on expected profits over a five year period of time, including the ultimate resale of Midway at the end of the five year period, discounted to their present value, whereas, Merchants' expert's determination of fair market value under the income capitalization approach was based on: "... development of cash flow expectations, year by year, over a presumed term of ownership. The prospective net cash flow, including the expected proceeds from future resale, are [sic] then discounted at the required rate of return in order to obtain an indication of total present value." Record at 2632. The method of determining what Rill refers to as "lost profits" and the income capitalization approach used to determine a property's fair market value are identical. Hence, Rill's evidence of future

---

**5.** Merchants alludes in a footnote that since neither Moore nor Aldering were qualified as certified appraisers of commercial real estate, they were not qualified to testified as to Midway's value. Merchants never expounds on this argument and therefore it has waived the issue. *See* Ind. Appellate Rule 8.3(A)(7). Moreover, both experts were qualified to testify. Moore is employed with a firm that does "field of valuation studies." Specifically, Moore advises owners as to the worth of their business and tells investors what they should pay for businesses. Record at 2878–83. Likewise, Aldering, a C.P.A., has experience valuing closely held businesses. Record at 3174–76.

profits was relevant not as anticipated lost profits as such, but rather as going to the fair market value of Midway on the date of the breach. Having concluded that evidence of future profits as they relate to the fair market value of Midway was admissible, and more importantly, that Merchants waived its argument that the trial court erred in admitting evidence of lost profits or Rill's prior hotel sale by admitting Plaintiff's Exhibits Numbers 1, 12, 17, and 18, without objection, we need not address Merchants' contentions that Rill's award of compensatory damages was improperly calculated; evidence of lost profits was inadmissibly speculative; the jury instructions regarding compensatory damages were erroneous; and, that lost profits were not foreseeable.

*Issue Three*

█ Merchants maintains that the evidence was insufficient to support an award of punitive damages. We agree.

█ Generally, punitive damages are not recoverable in Indiana for breach of contract. *Lawyers Title Insurance Corp. v. Pokraka* (1992), Ind., 595 N.E.2d 244, 250. To recover punitive damages in such a case, the plaintiff must prove by clear and convincing evidence that the defendant's actions were accompanied by malice, fraud, gross negligence, or oppressive conduct. *Id.; Tolliver v. Mathas* (1989), Ind. App., 538 N.E.2d 971, 977, *trans. denied.* The plaintiff must also show that the defendant's acts were not the result of a mistake of law or fact, honest error of judgment, overzealousness, mere negligence, or other noniniquitous human failing. *Bud Wolf Chevrolet, Inc. v. Robertson* (1988), Ind., 519 N.E.2d 135, 137. Further, the plaintiff must establish that the public interest will be served by the deterrent effect of a punitive award. *Arlington*, 545 N.E.2d at 579. However, on appeal, judicial scrutiny of an award of punitive damages is no greater than review of other sufficiency questions. *Eden United, Inc. v. Short* (1991), Ind.App., 573 N.E.2d 920, 926, *trans. denied.* We will affirm a judgment of punitive damages if, considering only the probative evidence and reasonable inferences supporting it, without weighing the evidence or assessing witnesses' credibility, a reasonable trier of fact could find such damages proven by clear and convincing evidence. *Id.*

Rill failed to satisfy his burden to secure a punitive damages award. Rill contends that the fact Merchants entered into two separate contracts with two separate purchasers on the same day, and the fact that Merchants failed to notify Rill that it had already contracted with Sunbelt, support the jury's award of punitive damage. Wooldridge and Massey both testified, however, that Merchants was not aware at the time of the breach that either the March 25, 1987 "proposal" sent to Rill or the "term sheet" prepared during Wooldridge's meeting with Sunbelt were binding contracts. Record at 2806–08; 3280; and, 3301–02. Rill has presented no evidence to the contrary. The burden is not on Merchants to prove that it made a mistake. Rather, Rill has the burden of presenting evidence from which it can be inferred from clear and convincing evidence that Merchants acted oppressively. *See Travelers Indemnity Co. v. Armstrong* (1982), Ind., 442 N.E.2d 349, 364. Rill further emphasizes the fact that Merchants received the best deal. We do not find this clear and convincing proof of oppressive conduct. Merchants was faced with an unfortunate dilemma, as it had two binding contracts and could not sell the property to both Rill and Sunbelt; thus, Merchants was required to breach its contract with one of the parties. Merchants' conduct was in no way comparable with that of the defendant in *Tolliver*, 538 N.E.2d 971, as Rill asserts. In *Tolliver*, unlike the case at bar, there was evidence of fraud and oppressive conduct by the defendant commingling with the breach of contract to support the award of punitive damages. *Id.* at 977. We discern nothing compelling the conclusion that Rill is entitled to punitive damages. There was no evidence that Merchants' conduct was accompanied by malice, fraud, gross negligence, or oppressive conduct. Merchants' breach of contract is not inconsistent with mistake of fact, honest error, or

mere negligence. *See Bud Wolf,* 519 N.E.2d at 137.

We affirm the trial court's award of compensatory damages, reverse the award of punitive damages, and remand for the trial court to enter judgment in accordance with this opinion.

Affirmed in part, reversed in part, and remanded.

ROBERTSON and BAKER, JJ., concur.