**TIPMONT RURAL ELECTRIC MEMBERSHIP CORPORATION, Appellant–Defendant,**

v.

**Gregg FISCHER and Susan Fischer, Appellees–Plaintiffs.**

**No. 61A05–9604–CV–135.**

Court of Appeals of Indiana.

July 9, 1998.

Order Substituting Citation, July 29, 1998.

Rehearing Denied Nov. 2, 1998.

Peter L. Obremskey, Parr Richey Obremskey & Morton, Lebanon, John R. Kenley, Kenley & Kenley, Rockville, for Appellant–Defendant.

James O. McDonald, Everett Everett & McDonald, Terre Haute, Max E. Goodwin, Terre Haute, for Appellees–Plaintiffs.

## OPINION

SHARPNACK, Chief Judge.

Tipmont Rural Electric Membership Corporation ("Tipmont") appeals a judgment in favor of Gregg and Susan Fischer for $1,683,-800. Tipmont raises five issues, which we consolidate and restate as:

1) whether the Fischers failed to establish that the reduction in milk production in their cows was proximately caused by stray voltage in their dairy facilities;

2) whether the damage award was excessive and outside the scope of the evidence presented; and

3) whether the trial court erroneously instructed the jury that it could award damages for loss of cull cow income, unborn calf income, and prejudgment interest.

We affirm.

### FACTS

The facts most favorable to the judgment follow. On May 12, 1992, the Fischers filed a complaint against Tipmont alleging damages caused by stray voltage[1] on their dairy farm. The complaint sounded in products liability, negligence, breach of warranty of fitness for a particular purpose, and punitive damages.

On October 11, 1994, a jury trial began in Parke Circuit Court. The case was submitted to the jury twenty-one days later on the products liability, negligence, and punitive damages claims. On November 9, 1994, the jury returned a verdict in favor of Tipmont on the issue of products liability but was deadlocked on the issues of negligence and punitive damages. As a result, the trial court granted a partial mistrial. Thereafter, the remaining case was reassigned to a different judge for retrial.

In October of 1995, the trial that led to this appeal began on the issues of negligence and punitive damages. On December 20, 1995, the jury returned a verdict in favor of the Fischers for $1,683,800.00 on the negligence claim but awarded no punitive damages.

### DISCUSSION

On appeal, a general verdict will be sustained upon any theory consistent with the evidence. *Picadilly v. Colvin*, 519 N.E.2d 1217, 1221 (Ind.1988). We will neither reweigh nor judge the credibility of the witnesses, but will consider only the evidence most favorable to the judgment along with all reasonable inferences to be drawn therefrom. *Annon II, Inc. v. Rill*, 597 N.E.2d 320, 323 (Ind.Ct.App.1992), *reh'g denied, trans. denied.* We decide whether there is substantial evidence of probative value supporting the trial court's judgment. *Id.* Only where

---

1. The distribution line providing energy to the Fishers' farm consists of three wires, two of which are energized and one of which is neutral. The energized wires bring usable energy to the farm, and the neutral wire provides a return path to the substation. As a result of the electric operations, some neutral voltage may be carried on the electric system into a cow environment and create a condition known as "stray voltage." Stray voltage is small voltage which can be measured between two possible contact points. If these two contact points are simultaneously contacted by an animal, a current will flow.

there is a total failure of evidence or where the jury's verdict is contrary to the uncontradicted evidence will it be reversed. *Id.* Thus, Tipmont labors under a heavy burden in asserting error.

## I.

The first issue is whether the Fischers failed to establish that the reduction in milk production in their cows was proximately caused by stray voltage in their dairy facilities.[2] A reasonable connection between a defendant's conduct and the damages which a plaintiff has suffered is an essential element in a cause of action for negligence. *Johnson v. Owens,* 639 N.E.2d 1016, 1023 (Ind.Ct.App.1994), *reh'g denied, trans. denied.* Proximate cause requires, at a minimum, that the harm would not have occurred but for the defendant's conduct. *Id.* For the plaintiff to carry the burden of proof, there must be evidence of probative value based on facts, or inferences to be drawn from the facts, establishing that the occurrence was the cause in fact of the injury. *Daub v. Daub,* 629 N.E.2d 873, 877 (Ind.Ct. App.1994), *trans. denied.* The plaintiff's burden may not be carried with evidence based merely upon supposition or speculation. *Id.* Standing alone, evidence which establishes a mere possibility of cause, or which lacks reasonable certainty or probability, is not sufficient evidence by itself to support a verdict. *Id.* The question of proximate cause is ordinarily for the jury to decide. *Senco Products, Inc. v. Riley,* 434 N.E.2d 561, 569 (Ind. Ct.App.1982).

We note that much of Tipmont's argument compares the qualifications and testimony of the Fischers' experts to that of its own experts. This argument goes to the weight and credibility to be given each expert's testimony. As we previously mentioned, we neither reweigh the evidence nor judge the credibility of the witnesses. *See Annon II,* 597 N.E.2d at 323. Rather, we focus our attention on whether the Fischers presented evidence from which the jury could reasonably conclude that the stray voltage caused the Fischers' injuries.

At trial, the Fischers called Keith Folger as an expert witness. Folger retired in 1988 as head of the Otter Tail Power Company stray voltage program. Folger explained the concept of stray voltage to the jury and how stray voltage may affect cows. Folger testified that during his career, he had tested for stray voltage on more than 800 dairy farms and had taken corrective measures when stray voltage was determined to be a problem. Folger also stated that he had been a consultant for seven dairy farms on issues related to stray voltage since he left Otter Trail Power Company.

During his testimony, Folger testified that he had observed the reaction of milk cows on many farms where stray voltage had ranged from .5 volts to 1 volt. Folger indicated that the common reactions of cows at that voltage level include production of milk with a high somatic cell count,[3] nervousness, reluctance to enter the milking parlor, and a dull coat. Folger further stated that, in general, somatic cell counts in the milk dropped dramatically, the cows' coats brightened, and the cows looked healthier after these levels were corrected for six months. In addition, in one of the exhibits entered into evidence, Folger explained that once stray voltage is reduced to .35 volts or less, the cows are less nervous, enter milking parlors easier, have increased milk production, and take less time to milk.

Folger also offered testimony concerning his work with the Fischers' farm. Folger conducted his first tests on their farm on March 20, 1992, after Tipmont had installed a blocker isolating the dairy barn from Tipmont's primary neutral line. Folger indicated that the "cows were nervous and seemed to avoid making contact with building walls and the pipes in gates and dividers." Record, p. 3055. Folger concluded that had the dairy barn not been isolated, the cows would

---

**2.** Tipmont does not raise any issue as to its negligence, only as to the causal connection between stray voltage at the Fischers' farm and the injury to their dairy herd.

**3.** The somatic cell count indicates the concentration of somatic cells, primarily white blood cells. A high somatic cell count is an indication of mastitis, which is the inflammation of the udder, and can cause permanent scaring and decreased milk production.

have experienced spikes of at least 2 volts and steady voltage of 1 volt. Furthermore, Folger indicated that the step potential between the holding pen and the milking parlor would have been similar.[4]

Folger conducted another visit to the Fischers' farm in May of 1992. Folger again returned to the Fischers' farm in 1993 to examine the calf barn. Folger concluded that the voltage in the calf barn was high enough to cause problems. He found spikes from a water heater measuring higher than 2.5 volts. After concluding that the high voltage was coming from the heater, Folger returned to the farm with representatives of Tipmont and a veterinarian. After the visit, Folger issued a report indicating that if the calf barn was to operate during the next winter, some changes would have to be made because of the voltage problem. Folger also stated that although there were still problems with the calf barn, the cows in the holding area of the barn looked better during this visit since the barn service had been isolated. He further indicated that it looked like "two different herds of cows." Record, p. 3072.

Folger testified that in his opinion, the Fischers' dairy barn had experienced a problem with stray voltage for "many years" and that the calf barn had a problem in the winter when the Fischers were using the stock tank and heater. Record, p. 2972. The voltages present on the Fischers' farm were similar to or greater than voltages which Folger had learned through experience generally affected the cows' behavior and the somatic cell count of the milk. In addition, a Purdue study admitted into evidence confirmed Folger's opinion as to the relationship he had observed between voltages of .5 volts to 1 volt and somatic cell counts and milk production.

In addition to Folger, the Fischers called Layton Hoysler, an agriculture consultant. Hoysler testified that the industry standard was that .5 volts or above could have an effect on cattle and cause economic consequences. Hoysler testified that the Fischers were "following the practices that most dairymen do, as far as herd health." Record, p. 4557. He also testified that before the blocker was installed in the dairy barn, there were fifteen instances where somatic cell counts exceeded a million. Hoysler further stated that after the blocker was installed, there have been no instances of somatic cell counts exceeding a million. Hoysler's report issued following his examination of the Fischers' farm confirmed his testimony regarding the somatic cell counts. In addition, immediately following the graph of the somatic cell counts for the Fischers' farm, the report stated:

> "It is our experience in working with many dairy herds in several states that stray voltage results in high somatic cell counts. Dairy experts and dairy health specialists appear to be unanimous in their agreement that there is a direct correlation between the high cell counts and injured udders which have scar tissue and reduced milk producing tissues. The final result is substantially reduced milk production and a likelihood of continued udder problems including mastitis."

Record, p. 4548. After studying the Fischer farm in detail, including other factors which might account for low milk production, Hoysler concluded, "It is our opinion that the economic losses estimated and defined in this report are the direct result of the voltage problem."[5] Record, p. 4548.

In sum, the consensus of the experts has been that voltage of .5 volts or more may cause problems for dairy animals. Evidence confirmed that steady voltages at cow contact points in the Fischers' barns were at or

4. The step potential is the difference between the voltage level of the grounded milk parlor and the floor and sides of the non-grounded holding pen. In other words, the step potential is defined as the voltage between a cow's hoofs as it moves from the holding area into the milking parlor.

5. Tipmont contends that this sentence refers to the preceding paragraph which mentioned the

"alleged 'neutral to earth' voltage problem." Record, p. 4391. However, interpreting the meaning of the statement is within the province of the jury as the factfinder. We will not reweigh the evidence and will consider only the facts most favorable to the judgment. *See Annon II*, 597 N.E.2d at 323.

above that level, with frequent spikes at significantly higher levels. The evidence also demonstrated that the voltage on the calf water tank was between .5 volts to 2.5 volts. The undisputed evidence established that the Fishers' herd suffered from many of the common symptoms of stray voltage problems, including nervous and reluctant behavior, dull coats, decreased milk production, and elevated somatic cell counts in the milk. Evidence was presented that the dairy herd's problems were not caused by inadequate feed, medication, or management practices. Finally, evidence was presented that the condition of the cows and milk production improved significantly after the barn service had been isolated by Tipmont.

We conclude that the Fischers presented evidence of probative value based on facts, or inferences to be drawn from the facts, establishing that the stray voltage was the cause in fact of the injury. *See Daub*, 629 N.E.2d at 877. The evidence presented by the Fischers and their experts, and the reasonable inferences drawn therefrom, are based on more than mere supposition or speculation that stray voltage caused the damages. *See Johnson*, 639 N.E.2d at 1023. Therefore, because there is not a total failure of evidence of proximate cause and the verdict is not contrary to the uncontradicted evidence, we affirm the judgment. *See Annon II*, 597 N.E.2d at 323.

## II.

The second issue for our review is whether the damage award was excessive and outside the scope of the evidence presented. Specifically, Tipmont contends that the award was $202,800 in excess of the evidence most favorable to the Fischers. However, Tipmont did not file a motion to correct error alleging that the damages awarded were excessive. Pursuant to Ind. Trial Rule 59(A)(2), a motion to correct error is a prerequisite to appeal when a party seeks to raise a claim that the damage award was either excessive or inadequate. The failure to file a mandatory motion to correct error prevents this court from considering the issue on appeal. *Howard v. Trevino*, 613 N.E.2d 847, 848–849 (Ind.Ct.App.1993).

Therefore, the damage award is not properly before us.

Tipmont attempts to make the argument that it is actually challenging the jury award on the basis that the award was outside the evidence rather than merely excessive and, therefore, that it was not required to file a motion to correct error. We are unpersuaded by this argument for two reasons. First, whether the award was excessive or beyond the scope of the evidence effectively boils down to the same question: whether the jury awarded too much money to the Fischers. As such, the argument is a distinction without a difference for purposes of T.R. 59(A)(2). Tipmont was required to bring the alleged overabundance of the award to the trial court's attention.

Second, Tipmont cites two cases in support of its contention that the award must be within the scope of the evidence presented. *See Carbone v. Schwarte*, 629 N.E.2d 1259 (Ind.Ct.App.1994); *Greives v. Greenwood*, 550 N.E.2d 334 (Ind.Ct.App.1990). Although we agree with the proposition that a jury award must be within the evidence presented, we do not find that these cases necessarily permit a challenge to the amount of a jury award when a motion to correct error was not filed. In fact, in both of these cases, the party challenging the award filed a motion to correct error. Because motions to correct error were properly filed in those cases, it was appropriate for us on appeal to address the question of whether the awards were supported by the evidence. Therefore, we are unpersuaded by Tipmont's argument that it was not required to file a motion to correct error. Accordingly, Tipmont waived our review of this issue. *See Howard*, 613 N.E.2d at 848–849.

Waiver notwithstanding, we do not agree that the award was excessive or beyond the scope of the evidence. Damages are particularly a jury determination. *Prange v. Martin*, 629 N.E.2d 915, 922 (Ind. Ct.App.1994), *reh'g denied, trans. denied.* We will not substitute our idea of a proper damage award for that of the jury. *Id.* Rather, we will look only to the evidence and inferences therefrom which support the jury's verdict. *Id.* A verdict awarding dam-

ages will only be reversed when it is apparent from a review of the evidence concerning the injuries that the amount of damages assessed by the jury is so great as to indicate that the jury was motivated by prejudice, passion, partiality, or corruption, or considered some improper element. *Lutheran Hospital of Ind., Inc. v. Blaser,* 634 N.E.2d 864, 873 (Ind.Ct.App.1994), *reh'g denied.* We will not deem a verdict to be the result of improper considerations unless it cannot be explained on any other reasonable ground. *Prange,* 629 N.E.2d at 922. Thus, if there is any evidence in the record which supports the amount of the award, even if it is variable or conflicting, the award will not be disturbed. *Id.* Our inability to actually look into the minds of jurors and determine how they computed an award is, to a large extent, the reason behind the rule that a verdict will be upheld if the award falls within the bounds of the evidence. *Symon v. Burger,* 528 N.E.2d 850, 853 (Ind.Ct.App.1988).

In its brief, Tipmont contends that the jury's award was well beyond the scope of the evidence presented at trial. Tipmont speculates at one point that the abundant award is a result of the jury improperly considering the testimony presented as to the Fischers' trial expenses. Tipmont states that the evidence as to trial expenses was "offered under the guise of establishing the measure of damages for punitive damages" and "so tainted the jury that it led to, among other things, a verdict exceeding the compensatory damages" assessed by the Fischers' expert witness. Appellant's brief, p. 44. We are not persuaded by Tipmont's speculation as to the damages because there is evidence in the record which supports the jury's award. Evidence was presented that Gregg Fischer was in the top 15% of Indiana's dairymen. Hoysler, who provided the economic report assessing the damages, testified that his calculations were conservative and were not based on the presumption that Fischer was in the top 15%. Hoysler stated that he assumed Fischer was lower than that for purposes of the calculations. Despite his "conservative" calculations, Hoysler stated that, "it's my opinion that … Gregg Fischer is above the average of the Indiana produc-

ers. In other words, he is in the category of the DHIA people." Record, p. 4611. Hoysler further stated that he believed that Fischer could have had a milk production higher than the average used for purposes of calculating damages if he had had the finances and used artificial insemination.

Therefore, the amount of the compensatory damages awarded over the recommendation in Hoysler's report can be explained by the jury believing that Fischer was a top 15% dairyman and that he could have produced more than Hoysler's conservative estimates. As we previously mentioned, we will not deem a verdict to be the result of improper considerations unless it cannot be explained on any other reasonable ground. *Prange,* 629 N.E.2d at 922. No evidence of improper motivation appears in the record, and Tipmont offers no examples of such. Moreover, the trial court gave a limiting instruction with regard to the evidence of trial expenses, which stated in pertinent part:

> "The Court has admitted evidence in this trial of the amount of Plaintiffs' litigation costs for your consideration in determining the appropriate amount of punitive damages herein should you choose to award punitive damages. In the event that you determine the plaintiffs are not to be awarded punitive damages, then you may not consider these expenses in awarding compensatory damages.
>
> The mere fact that the court is instructing you on the issue of punitive damages should not be considered by you as any indication by the court that the plaintiffs are entitled to recover punitive damages."

Record, pp. 1058–1059. On appeal, we will presume the jury followed the law contained within the trial court's instruction and applied that law to the evidence before it. *Griffin v. Acker,* 659 N.E.2d 659, 664 (Ind.Ct. App.1995), *reh'g denied, trans. denied.* Because the jury did not award punitive damages and because the compensatory damage award can be supported by the evidence at trial, the award is not excessive or beyond

the scope of the evidence.[6]

## III.

The third issue for our review is whether the trial court erroneously instructed the jury that it could award damages for loss of cull cow income, loss of unborn calf income, and prejudgment interest. Initially, we note that we are inclined to waive this issue on the basis that Tipmont failed to file a motion to correct error for two reasons. First, the challenges to the instruction relating to the type of damages the jury was permitted to award is ultimately an additional challenge to the amount of damages awarded by the jury. As such, this challenge should have been raised in the motion to correct error as part of the excessiveness allegation. *See* T.R. 59(A)(2). Second, even if the issue was not required to be raised in a motion to correct error, it should have been raised in such a motion for the sake of judicial economy and as a matter of practicality. All issues relating to the damage award should have been addressed in one motion to correct error so that the trial court could have a full and fair opportunity to review the damage award and make any necessary corrections or adjustments at one time. However, as we discuss below, Tipmont's objections to the damage instruction were not specific enough to properly preserve error on appeal. Therefore, Tipmont waived appellate review of the instructions because of inadequate objections, and we need not decide whether the issue was required to be raised in a motion to correct error. We will discuss each objection to the instruction in turn.

## A.

▮ The first question with respect to the damage instruction is whether the trial court erroneously instructed the jury it could award loss of cull cow and unborn calf income. The giving of an instruction is within the discretion of the trial court and will be upheld on appeal if any evidence supports it. *Homehealth, Inc. v. Northern Ind. Public*

*Service Co.,* 600 N.E.2d 970, 975 (Ind.Ct.App. 1992), *reh'g denied.* However, Ind. Trial Rule 51(C) states that "[n]o party may claim as error the giving of an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection." The purpose of this trial rule is to protect the trial court from inadvertent error. *Terre Haute Regional Hospital, Inc. v. El–Issa,* 470 N.E.2d 1371, 1376 (Ind.Ct.App.1984), *reh'g denied, trans. denied.* Thus, the objection to the instruction must be sufficiently specific to make the trial judge aware of the alleged error before he reads the instruction to the jury. *Id.* Objections to instructions must state why the instruction is misleading, confusing, incomplete, irrelevant, not supported by the evidence, or an incorrect statement of the law. *See Carrier Agency, Inc. v. Top Quality Bldg. Products, Inc.,* 519 N.E.2d 739 (Ind.Ct. App.1998, *trans. denied.*). An objection which is not specific preserves no error on appeal. *Johnson v. Naugle,* 557 N.E.2d 1339, 1341 (Ind.Ct.App.1990). In other words, failure to comply with the requirements of T.R. 51(C) results in the waiver of any error in the giving of the instruction. *Terre Haute,* 470 N.E.2d at 1376. In addition, a party claiming error in the giving of an instruction is limited to his stated objection at trial. *Weller v. Mack Trucks, Inc.,* 570 N.E.2d 1341, 1343 (Ind.Ct.App.1991).

▮ Tipmont did not comply with the requirements of T.R. 51(C). Tipmont's objection to these two damage elements of the instruction consisted of "[b]ut I think the loss of cull cow income is very ... is speculative. I think the loss of calf income is speculative." Record, p. 9352. Maintaining that the losses are speculative presents no basis for an objection to the instruction. Tipmont did not clarify whether the thrust of its complaint was that the evidence presented at trial failed to support the giving of the instruction or that the instruction was a misstatement of the law.

---

**6.** Based on this conclusion, we need not address the specific question of whether the trial court erroneously admitted the evidence of the Fischers' trial expenses. Tipmont provides nothing more than speculation that the jury misused the evidence of the trial expenses to augment the compensatory award and fails to establish prejudice given that the jury did not award punitive damages.

To the extent Tipmont was trying to challenge the evidence with respect to cull cow and unborn calf income, it failed to sufficiently identify the argument. *See Poor Sisters of St. Francis Seraph v. Catron,* 435 N.E.2d 305, 309 (Ind.Ct.App.1982) (holding that an objection on the ground that the instruction "submits issues to the jury on which no evidence has been introduced and which should be withdrawn from the jury" was not specific enough to preserve error); *Harper v. Goodin,* 409 N.E.2d 1129, 1135 (Ind.Ct.App. 1980) (finding an objection "that there was no evidence to support an instruction and that it does not state the law concerning punitive damages in Indiana" to be insufficient to preserve error). Tipmont did not specifically state that there was no evidence to support the giving of the instruction or that the evidence supporting the instruction was erroneously admitted.[7]

Moreover, Tipmont was required to properly object when the evidence relating to cull cow unborn calf income was presented during the trial. *See Norrington v. Smith,* 154 Ind.App. 413, 418, 290 N.E.2d 60, 63 (1972) (holding that the evidence now alleged to have been incompetent was nonetheless properly admitted without timely objection and properly before the jury); *St. Anthony Medical Center, Inc. v. Smith,* 592 N.E.2d 732, 737 (Ind.Ct.App.1992) (holding that evidence admitted without a timely objection is entitled to full weight and consideration), *trans. denied.* Tipmont did not object to the admission of Hoysler's economic report which included a detailed estimate of lost cull cow and unborn calf income. In addition, Hoysler explained the information and estimates without an objection from Tipmont. Further, Tipmont does not designate the admission of the evidence as an error on appeal. *See Dettman v. Sumner,* 474 N.E.2d 100, 106 (Ind.Ct.App.1985) (holding that the failure to argue the objections raised in the trial court waives such issues on appeal). As such, Tipmont is precluded from arguing that there was no evidence upon which to base the instruction.

To the extent Tipmont was attempting to argue that the instruction was a misstatement of the law or that giving the instruction was contrary to law, its objection to the instruction was insufficient because it did not specify why the instruction was erroneous. *See Pilkington v. Hendricks County Rural Elec. Membership Corp.,* 460 N.E.2d 1000, 1009 (Ind.Ct.App.1984) (holding that an objection to an instruction merely on the grounds it is an improper statement of law or highly prejudicial is inadequate and that an objection that an instruction does not state a correct principle of law or is confusing and misleading preserves nothing for review).

Therefore, Tipmont's objection failed to specifically and distinctly cite an error in the instruction. The objection was too general and indefinite to constitute a proper objection pursuant to T.R. 51(C). *See Poor Sisters,* 435 N.E.2d at 309. As a result, Tipmont failed to preserve the issue for review on appeal. *See Johnson,* 557 N.E.2d at 1341.

### B.

The final question relating to the damage instruction is whether the trial court erroneously instructed the jury that the Fischers were entitled to prejudgment interest. Specifically, Tipmont contends that prejudgment interest was not appropriate in this case and, therefore, the jury should not have been instructed that it could award such interest as part of the compensatory damages.

As we previously mentioned, we review the giving of jury instructions only for an abuse of discretion. *Homehealth,* 600 N.E.2d at 975–976. If any evidence supports the instruction, we will uphold the trial court's giving of the instruction. *Id.*

■ As an initial matter, we note that Tipmont also contends in the issue heading that the trial court "erred in admitting certain evidence" with respect to prejudgment interest. Appellant's brief, p. 34. However,

---

**7.** Tipmont does expand and develop its argument on appeal by stating that the evidence presented by Hoysler with respect to the loss of cull cow income and loss of calf income was speculative and that damages based upon these losses con-

travene the holding in *Greives,* 550 N.E.2d at 334. However, as we previously stated, a party claiming error in the giving of an instruction is limited to his stated objection at trial. *Weller,* 570 N.E.2d at 1343.

the argument following the issue heading fails to mention the admission of evidence and focusses instead on whether giving the instruction was erroneous. Tipmont does not identify any specific question, offer of an exhibit, objection, or ruling on admissibility for us to review. Moreover, Tipmont fails to cite pages of the record on which any alleged errors are disclosed. We will not search the record to determine whether the trial court erroneously admitted evidence on prejudgment interest. *See Gossmeyer v. State,* 482 N.E.2d 239, 242 (Ind.1985). Although Tipmont did expand on its challenge to the admissibility of the evidence in its reply brief by including a discussion of the objections it made, Tipmont cannot raise an argument for the first time in its reply brief. *See Greives,* 550 N.E.2d at 339 (holding that this court had no jurisdiction to determine those issues belatedly raised in a reply brief). Therefore, Tipmont waived any challenge to the admissibility of evidence with regard to prejudgment interest. *See* Ind.App. R. 8.3(A)(7); *Berger v. Berger,* 648 N.E.2d 378, 381 (Ind.Ct.App. 1995) (stating that the failure to develop a cogent argument with citations to the record and relevant authority can result in a waiver of that issue on appeal).

■■■ Turning to Tipmont's remaining challenge, Tipmont contends on appeal that the trial court's decision to instruct the jury that it could award prejudgment interest was erroneous because the amount of the damages was not ascertainable and there was not an unreasonable delay in payment. However, during the trial, Tipmont's objection to the instruction on the question of prejudgment interest consisted of the following:

"Number six, the interest element, we object to. Frankly, juries are not very good at calculating interest. Historically they don't calculate interest. I don't deny that in some cases the Court has the authority to award pre-judgment interest, and that's what this is. It's normally the Court that makes that award. But in this case and cases generally, it's got to be ... the damages must either be capable of ascertainment in connection with ... in accordance with fixed or ascertainable rules of calculation or some contact that gives a right to

interest. And of course that's not what we're dealing with here. No contract. . . . I just don't think it's right to tel [sic] a jury they can award interest at some rate on these elements of damage. . . .

\* \* \* \* \*

Interest can only come in if it's ascertainable. Here it isn't. If it's under contract. Here it isn't. And I don't believe they're entitled to any compensation for ... for loss of interest. And, you know ... damages can't be speculative. I mean ... they're specifically told you can't base your decision on speculation or conjecture."

Record, pp. 9348, 9353. It is unclear from this statement the precise nature of Tipmont's objection. The most likely interpretation of the objection is that although prejudgment interest is appropriate in some cases, Tipmont was arguing that such interest is not appropriate in this case because the evidence did not demonstrate an ascertainable amount of damage and an unreasonable delay. In other words, the evidence did not support the giving of a prejudgment interest instruction. However, Tipmont did not clearly and distinctly state this objection as required by T.R. 51(C). As we previously mentioned, an objection which is not specific preserves no error on appeal. *Johnson,* 557 N.E.2d at 1341.

Moreover, Tipmont did not raise a timely objection to all of the evidence on prejudgment interest. The Fischers offered Hoysler's economic report into evidence without objection from Tipmont. One of the areas of damage and economic loss estimated in the report was the "[i]nterest created by reduced cow numbers, low milk production, reduced income from cull cows and reduced numbers of calves produced." Record, p. 4548. Table G of the report reflects the interest computed by Hoysler on the ascertainable lost sales of milk, cull cows, and calves for each year, totaling $414,745.83. It was not until later, when the Fischers asked Hoysler to "explain to the jury how the lack of cash flow from lack of production effects [sic] the income of the farm or the amount of expense that must be made for debt retirement purposes" and whether Table F of his report illustrates the

type of financial problems associated with stray voltage, that Tipmont objected. Record, p. 4653. Tipmont's counsel then stated, "Well, now let me object to that. Judge, I want to be heard on this whole debt retirement and interest issue, with regard to whether or not it's compensable." Record, p. 4653. After hearing arguments, the trial court overruled Tipmont's objection to the consideration of interest as a possible element to damages.

The report detailing the prejudgment interest was admitted without a timely objection from Tipmont. Furthermore, the trial court overruled Tipmont's objection to Hoysler's testimony regarding the report. As we previously determined, Tipmont has waived appellate review of the evidentiary rulings of the trial court because it failed to develop a cogent argument in its brief with adequate citations to the record and authority. Therefore, Tipmont cannot challenge the propriety of the evidence from which the trial court determined an instruction on prejudgment interest was appropriate.

In addition, one of the points in Tipmont's objection to the instruction was that the determination of prejudgment interest is better left to the trial court because "[f]rankly, juries are not very good at calculating interest." Record, p. 9348. However, Tipmont did not request that the jury be instructed on the requisite elements of prejudgment interest to ensure that the jury would properly evaluate whether interest was appropriate in this case. Furthermore, Tipmont did not allege that the instruction misstated the law with respect to prejudgment interest. Therefore, Tipmont cannot now challenge the instruction on those grounds. *See Weller,* 570 N.E.2d at 1343. Consequently, Tipmont is bound by its objection at trial and failed to adequately preserve this issue for our review.

Accordingly, we hold that there was sufficient evidence of proximate cause presented from which the jury could conclude that the stray voltage caused the damages suffered by the Fischers. We also hold that Tipmont waived review of the issue of whether the damage award was excessive and outside the scope of the evidence by failing to file a motion to correct error. As for the issues relating to loss of cull cow and unborn calf income and prejudgment interest, we hold that Tipmont waived review of them on the merits.

For the foregoing reasons, we affirm the judgment of the trial court.

Affirmed.

DARDEN, J., concurs.

RUCKER, J., concurs in part, dissents in part with separate opinion.

RUCKER, Judge, concurring in part and dissenting in part.

I fully concur with the majority on issue I. The Fischers presented sufficient evidence establishing that stray voltage proximately caused injury to their herd of cows.

On issue II, I concur with that portion of the majority opinion which addresses Tipmont's damages argument on the merits. I dissent to the remainder because the majority has imposed a requirement on Ind. Trial Rule 59 which simply is nonexistent. Although it does not say so in express terms, the majority's opinion can only be read as requiring that a motion to correct error must be filed *whenever* a damage award is challenged on appeal. That is not the law. So long as a party is challenging a damage award on grounds other than it is excessive or inadequate, a motion to correct error is not required. In that regard I disagree with the majority's view that there is a no distinction between challenging a damage award as unsupported by the evidence versus challenging an award as excessive or inadequate. There is a distinction, albeit subtle.

As to issue III, I dissent. Under this heading the majority has resolved the issues raised by Tipmont on grounds of waiver. This court has a long history of examining substantive claims "waiver notwithstanding." This was a difficult and complicated case, tried over a period of a year and two months, generating a 9,457 page record contained in 40 volumes. In my view Tipmont deserves the benefit of the majority's analysis on the merits, rather than a resolution of the issues on procedural grounds. Further, I am not convinced that the objections Tipmont raised

at trial were inadequate to preserve error for review.