**Chris McGEHEE, Appellant–Defendant,**

v.

**Travis and Tamara ELLIOTT, Appellees–Plaintiffs.**

No. 88A05–0509–CV–559.

Court of Appeals of Indiana.

June 30, 2006.

John A. Kraft, Young Lind Endres & Kraft, New Albany, IN, Attorney for Appellant.

Larry W. Medlock, Paoli, IN, Attorney for Appellees.

## OPINION

SHARPNACK, Judge.

Chris McGehee appeals the trial court's judgment in favor of Travis and Tamara Elliott (the "Elliotts"). McGehee raises two issues, which we restate as:

I. Whether the trial court's findings that McGehee breached his contract to provide the Elliotts with a right of first refusal on McGehee's land is clearly erroneous; and

II. Whether the trial court's findings regarding damages are clearly erroneous.

We affirm in part, reverse in part, and remand.[1]

The relevant facts follow. On April 1, 2000, the Elliotts entered into a purchase agreement with McGehee to buy a 68.211-acre tract of land ("Tract 2") in Washington County, Indiana. The Purchase Agreement contained the following provi-

sion regarding the adjoining tract of land ("Tract 3"): "Buyers to have a ten day first right of refusal on the adjoining 64.69 acres on the South side of the 68.211 acres. The agreed upon sale price of $115,000. This Agreement will expire on April 1, 2002. The adjoining property will remain on the market for sale." Appellant's Appendix at 75. The real estate agency for the sale was Landmark Realty, and Alice McIntosh was the principal broker while Leonard McCracken was the agent dealing directly with the Elliotts.

On May 18, 2000, McGehee conveyed Tract 2 to the Elliotts by a deed that provided: "BUYER HAS INSPECTED PROPERTY AND UNDERSTANDS THAT IT IS SOLD 'AS IS.'" *Id.* at 78. The deed also contained certain restrictive covenants, including a restriction that limited agricultural usage of the land to "only one animal per acre," excluding household pets. *Id.* at 79. Tract 3 was also subject to this restrictive covenant. The Elliotts, who raise sheep, desired to have more than one animal per acre, and McGehee issued a deed of correction without the restrictive covenants. A ditch or ravine splits the front twenty acres of Tract 2 from the back forty-eight acres. The Elliotts were aware of the ditch or ravine at the time they purchased Tract 2. According to Tamara, she was given permission to use a road on Tract 3 to access the back forty-eight acres of Tract 2 while Tract 3 remained in McGehee's ownership.

In late 2000 or early 2001, McGehee received an offer on Tract 3 from John Hasewinkel. An employee of McGehee communicated the offer to McIntosh, and McGehee also asked McIntosh whether the Elliotts would be exercising their right of

---

1. We direct McGehee's attention to Ind. Appellate Rule 46(A)(10), which requires an appellant's brief to "include any written opin-ion, memorandum of decision or findings of fact and conclusions thereon relating to the issues raised on appeal."

first refusal. McIntosh told McGehee that the Elliotts would not be able to purchase Tract 3. However, the Elliotts did not receive notice of the offer on Tract 3. On January 23, 2001, McGehee sold Tract 3 to John Hasewinkel for $116,280.00 subject to the animal limitation restrictive covenant.

In the spring of 2001, the Elliotts became aware that Tract 3 had been sold. As a result, the Elliotts filed a complaint against McGehee on April 17, 2002, for breach of contract. The Elliotts requested damages for breach of contract, lost profits, court costs, and attorney fees. McGehee filed an answer and affirmative defenses claiming, in part, that the Elliotts' claim was barred by merger, waiver, and estoppel. The Elliotts later amended their complaint to add a claim against Landmark Realty.

After a bench trial, the trial court entered the following findings of fact and conclusions thereon:

\* \* \* \* \*

15. The opportunity to purchase the adjoining 64.69 acres was critical to the Elliotts' decision to purchase the original 68.211 acre tract.

16. Mr. McGehee sold the 64.69 acre tract before the Elliotts' first right of refusal had expired.

17. The Elliotts were never provided notice, nor given the opportunity to purchase the land which was the subject of Clause 11.

18. Mr. McGehee's employee David Hardy had a purchaser (John Hasewinkel) for the adjacent 64.69 acres of real estate in late 2000, and Mr. McGehee claimed he contacted his agent, Mrs. McIntosh, to advise her of the purchase agreement with Mr. Hasewinkel.

19. Mr. McGehee stated he was advised by his agent, Mrs. McIntosh, now deceased, that the Elliotts could not then afford to purchase and did not want the 64.69 acre tract.

20. The Elliotts:
 a. had no prior knowledge of the Hasewinkel purchase.
 b. had the financial resources to purchase Hasewinkel Tract.
 c. did not tell Mr. McGehee's agent, Mrs. McIntosh, that they did not want to purchase the Hasewinkel Tract.
 d. made no contact or demand upon Mr. McGehee until they filed this lawsuit [on]April 17, 2002.

21. In the year 2000 Mr. Elliott observed others exiting the driveway on the adjacent 64.69 acres of Mr. McGehee's real estate.

22. In the spring of 2001 Mr. Elliott observed someone cutting hay on the adjacent 64.69 acres of real estate, and inquiry was made through Mr. McCracken, an agent of Landmark.

23. Mr. McCracken learned from his employer and Mr. McGehee's agent, Alice McIntosh that the 64.69 acre tract had been sold prior to expiration of the Elliotts' first right of refusal.

24. Mr. McCracken then advised the Elliotts that someone else had purchased the adjacent 64.69 acres of Mr. McGehee's real estate.

25. The Elliotts directed their inquiries concerning the use of the adjacent 64.69 acres of real estate to Mr. McGehee's agent.

26. According to the Auditor Disclosure (Stipulated Ex. 8), John Hasewinkel paid One Hundred Sixteen Thousand Two Hundred Eighty Dollars ($116,280.00) for the 64.69 acre tract.

27. Chris McGehee made One Thousand Two Hundred Eighty Dollars

($1,280.00) more by selling the property to Mr. Hasewinkel than by selling to the Elliotts at the purchase price set by the first right of refusal;

28. The seller's agent in the Elliotts' real estate transaction was Leonard McCracken.

29. Mr. McCracken was an agent with Landmark Realty.

30. Landmark Realty was the agent of Chris McGehee.

31. Landmark Realty, Chris McGehee's agent, was aware of the intended purpose of the purchase and the importance of Clause 11.

32. Chris McGehee is a real estate professional with multiple properties who has been involved in many real estate transactions and who has many parcels of land listed to sell.

33. The Elliotts:

a. Wanted to purchase Chris McGehee's land to produce sheep.

b. Were raising sheep prior to signing a purchase agreement with Chris McGehee.

c. Needed more land to expand their sheep producing operation.

d. Are livestock producers, who raise and sell sheep in a specialized market.

e. Told Leonard McCracken what type of land they were looking for and the purpose of the land.

34. It was understood by Landmark Realty, with notice to Chris McGehee, that the Elliotts intended to purchase the real estate for agriculture purposes and restrictive covenants were not acceptable.

35. The first deed drafted by Chris McGehee and delivered to the Elliotts at closing contained restrictions.

36. Chris McGehee provided an amended corrected deed which did not have deed restrictions.

37. The Elliotts also expected to purchase the 64.69 acres pursuant to Clause 11 without deed restrictions.

38. The restrictive covenants originally placed on the Elliotts' deed were generally assigned to platted subdivisions and are not applicable to the real estate purchased and intended to be purchased by the Elliotts.

39. Restrictive covenants on other parcels are not enforced by Chris McGehee.

40. The Elliotts are fully utilizing the accessible real estate they purchased from Chris McGehee to produce sheep.

41. Access to the back 48 acres of the Elliotts [sic] property is by a road that enters on and runs through the Hasewinkel property.

42. The 48 acre field which is accessible through the Hasewinkel property is not accessible by road from the Elliotts' property due to a waterway ravine that traverses the Elliotts' property.

43. The Elliotts never sought permission or consent directly from Mr. McGehee to traverse his real estate nor to cut hay.

44. To utilize the 48 acres for sheep production it must be accessible to tractors, trailers, and other equipment.

45. Trailers and other equipment need a hard surface roadway to operate efficiently.

46. A roadway and bridge are necessary to access and utilize the back 48 acres of the Elliotts' property for sheep farming purposes now that they

are unable to purchase or use the adjacent 64.69 acre tract.

47. The total cost of the bridge and roadway is Forty Thousand Five Hundred Dollars ($40,500.00).

48. There is no bridge on the Elliotts' real estate.

49. The Elliotts

a. Cannot expand their sheep operation at their current site beyond the current inaccessible 48 acres.

b. Intended to use the adjacent 64.69 acres to raise sheep.

c. Have had their income is [sic] diminished by lack of access to the 48 acres and the lost opportunity to purchase the 64.69 acres.

50. The contract between the Elliotts and Mr. McGehee contained a clause which allowed attorney fees to be awarded to a non-breaching party;

51. The Elliotts have incurred reasonable attorney fees of Five Thousand Dollars ($5,000.00) as a result of Mr. McGehee's breach of contract.

52. The Elliotts claimed damages including lost profits from their sheep operation.

53. Agriculture and Sheep Expert James Brown testified that the yearly profit per acre on a meat producing sheep operation in the Washington County market ranges from Two Hundred Fifty Dollars ($250.00) to Five Hundred Dollars ($500.00). Although he was unfamiliar with all of the Elliotts' finances and business operation, he has visited the Elliotts on their real estate and the Elliotts' operation should fall within that range.

54. The Elliotts were generating a profit of approximately Five Hundred Dollars ($500.00) per acre annually from their sheep production in Palmy-ra before purchasing the McGehee property.

55. Mr. Elliott testified he could make a profit of Five Hundred Dollars ($500.00) per acre annually with full access to the back forty-eight (48) acres of his farm.

56. The Elliotts reinvest most of the profits they earn on their production of sheep.

57. The Elliotts presented no other evidence reflecting the actual cost of operating their sheep farm or their actual damages relating to the sheep operation.

58. For tax year 2000, the Elliotts claimed a loss on their farming operation of Eleven Thousand Eight Hundred Forty–Six Dollars ($11,846.00). (Defendant's Exhibit "A").

59. For tax year 2001 the Elliotts claimed a loss on their farming operation of Nine Thousand Twenty–Two Dollars ($9,022.00) (Defendant's Exhibit "B").

## CONCLUSIONS OF LAW

* * * * *

5. The parties were bound by their contract of April 1, 2000.

6. Pursuant to Section II of the Purchase Agreement Contract Chris McGehee was obligated to provide notice to the Elliotts of an intention to sell the adjoining 64.69 acres and give them the opportunity to purchase the acreage for One Hundred Fifteen Thousand Dollars ($115,000.00).

7. Although Mr. McGehee may have advised his agent Alice McIntosh of the Hasewinkel purchase agreement, he failed to notify the Elliotts as required by the purchase agreement.

8. Chris McGehee breached the contract by not providing notice to the

Elliotts prior to selling the 64.69 acres to John Hasewinkel.

9. The Elliotts have substantial damages.

\* \* \* \* \*

16. It was foreseeable that if the Elliotts did not obtain the 64.69 acres, they would not have access to 48 acres of their property.

17. The Elliotts are entitled to damages equal to the cost of a roadway and bridge at Forty Thousand Five Hundred Dollars ($40,500.00);

\* \* \* \* \*

20. Mr. McGehee's agreement to remove restrictions on the Elliotts' original acreage, indicates that some provisions of his restricted development were optional, including the restrictions limiting parcels to one (1) animal per acre.

21. It was foreseeable that if the Elliotts did not obtain the 64.69 acres, they would not be able to raise as many sheep and thus would lose profits;

22. Chris McGehee profited by One Thousand Two Hundred Eighty Dollars ($1,280.00) by selling the 64.69 acres to John Hasewinkel in breach of his contract of Travis Elliott and Tamara Elliott;

23. Chris McGehee may not profit from his breach of contract and the difference between the Elliotts contract price and the sale price to John Hasewinkel is One Thousand Two Hundred Eighty Dollars ($1,280.00) and shall be awarded to the Elliotts;

24. Pursuant to the terms of the purchase agreement, the Elliotts are entitled to Five Thousand Dollars ($5,000.00) in attorney fees.

25. The Elliotts have a duty to mitigate damages, therefore the Elliotts are entitled to 6 years lost profit on the currently inaccessible 48 acres at Four Hundred Dollars ($400.00) per acre per year for a total of One Hundred Fifteen Thousand Two Hundred Dollars ($115,200.00).

26. The Elliotts are entitled to 6 years lost profits on the adjoining 64.69 acres of Four Hundred Dollars ($400.00) per acre per year for a total of One Hundred Fifty-five Thousand Two Hundred Fifty-six Dollars ($155,-256.00).

27. Default Judgment was entered against Alice McIntosh d/b/a Landmark Realty on November 17, 2004.

28. Alice McIntosh d/b/a Landmark Realty and Chris McGehee are jointly and severally liable.

### JUDGMENT

The Court therefore finds for the Plaintiffs Travis and Tamara Elliott and enters a judgment of Three Hundred Seventeen Thousand Two Hundred Thirty-six Dollars ($317,236.00) plus Court Costs of $104.00 in favor of Travis and Tamara Elliott and against the Defendants Chris McGehee and Alice McIntosh d/b/a Landmark Realty jointly and severally. This judgment shall bear interest at the statutory rate (not 8%). This is a final and appealable judgment.

Appellant's Appendix at 7–18.

The trial court entered findings of fact and conclusions thereon pursuant to Ind. Trial Rule 52(A). We may not set aside the findings or judgment unless they are clearly erroneous. *Menard, Inc. v. Dage–MTI, Inc.*, 726 N.E.2d 1206, 1210 (Ind. 2000), *reh'g denied.* In our review, we first consider whether the evidence supports the factual findings. *Id.* Second, we

consider whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen,* 671 N.E.2d 98, 102 (Ind.1996). A judgment is clearly erroneous if it relies on an incorrect legal standard. *Menard,* 726 N.E.2d at 1210. We give due regard to the trial court's ability to assess the credibility of witnesses. *Id.* While we defer substantially to findings of fact, we do not do so to conclusions of law. *Id.* We do not reweigh the evidence; rather we consider the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment. *Yoon v. Yoon,* 711 N.E.2d 1265, 1268 (Ind.1999).

## I.

The first issue is whether the trial court's findings that McGehee breached his contract to provide the Elliotts with a right of first refusal on McGehee's land is clearly erroneous. McGehee argues that the trial court's findings regarding his breach of the right of first refusal are clearly erroneous because the right of first refusal was extinguished by the deed transferring Tract 2 to the Elliotts and because the Elliotts did not enforce their rights to Tract 3 in a timely manner. We will address each argument separately.

### A. *Merger by Deed.*

■ McGehee argues that the Elliotts' right of first refusal was extinguished because it was not referenced in the deed transferring Tract 2 to the Elliotts. Although neither party cites to *Stoneburner v. Fletcher,* 408 N.E.2d 545 (Ind.Ct.App. 1980), we find it to be directly on point. In *Stoneburner,* Fletcher bought property from Stoneburner, and the purchase agreement provided:

Seller is the owner of a Lot located immediately adjacent to the west of the within described real estate and agrees to give Buyers an opportunity to purchase same, in event same should be for sale at any time in the future, by paying an amount equal to the highest bona fide offer received by Seller and for which Seller is willing to sell.

408 N.E.2d at 546. Despite the language in the purchase agreement, Stoneburner sold the adjacent property to a third party without providing notice to Fletcher, and Fletcher filed a complaint against Stoneburner. The trial court entered judgment for Fletcher for $4,000. *Id.* at 546–547.

On appeal, Stoneburner argued that Fletcher's right to purchase the property terminated when Fletcher purchased the original property. *Id.* at 547–548. We disagreed and noted that under the doctrine or rule of merger by deed:

In the absence of fraud or mistake, all prior or contemporaneous negotiations or executory agreements, written or oral, leading up to the execution of a deed are merged therein by the grantee's acceptance of the conveyance in performance thereof.

*Id.* at 548 (quoting *Thompson v. Reising,* 114 Ind.App. 456, 462, 51 N.E.2d 488, 491 (1943)). The basis for the doctrine of merger is a concern:

with reservations or stipulations in a contract for a deed dealing with things or rights that would legally pass to the grantee by deed in the absence of such reservations or stipulations, and [Indiana cases] hold, in line with the weight of authority elsewhere, that such rights, if not carried forward into the deed, are extinguished thereby, and no action lies on the contract.

*Id.* at 549 (quoting *Thompson,* 114 Ind. App. at 462, 51 N.E.2d at 491). However, the court also noted:

If, however, the contract for the sale of land creates rights collateral to and independent of the conveyance, the contract to that extent survives a deed that is silent in respect thereto. This is on the theory that the conveyance is not necessarily a performance of such collateral and independent agreements, as for example, a provision in the contract that the seller within a fixed time shall repair the house on the premises to be conveyed. The point is made in many decisions on the subject that collateral undertakings, not a part of the main purpose of the transaction, i.e., the conveyance of real estate, by their very nature show an intent that they should not be merged in the deed, and therefore are not extinguished thereby.

*Id.* (quoting *Thompson*, 114 Ind.App. at 463, 51 N.E.2d at 491) (internal citations omitted).

We held that the right granted to Fletcher in the purchase agreement to purchase the adjoining lot "was not a part of the main purpose of the contract which was the sale and purchase" of the original property. *Id.* Further, we noted that "the use of the open-ended words 'at any time in the future' could be reasonably interpreted as an expression of the parties' intent, at the time of contracting, that the pre-emptive right would survive the conveyance of the principal property." *Id.* Consequently, we concluded that Fletcher's right to purchase the adjoining tract of land "survived the tender and delivery" of the deed to the original parcel. *Id.* at 550.

Similarly, here, the purchase agreement provided: "Buyers to have a ten day first right of refusal on the adjoining 64.69 acres on the South side of the 68.211 acres. The agreed upon sale price of $115,000. This Agreement will expire on April 1, 2002. The adjoining property will remain on the market for sale." Appellant's Appendix at 75. The right of first refusal was not the main purpose of the purchase agreement, and the language of the right of first refusal clearly indicates that it survived the conveyance of Tract 2 to the Elliotts. The right of first refusal granted to the Elliotts was collateral and did not merge with the deed. *See, e.g., Stoneburner*, 408 N.E.2d at 549; *Stack v. Commercial Towel & Unif. Serv.*, 120 Ind.App. 483, 494–495, 91 N.E.2d 790, 795 (1950) (holding that "[a]ppellant's agreement to grant an easement over an adjoining parcel of real estate so long as appellant owned the property was independent of and collateral to appellant's covenant to convey the land by a general warranty deed and was not merged by the execution of the deed").

## B. Delay in Enforcement of Right of First Refusal.

 McGehee also argues that the Elliotts waived the right of first refusal by their delay in enforcing the right. According to McGehee, the right of first refusal was transformed into an option that had to be exercised within the life of the option. McGehee contends that the Elliotts were required to act on the right of first refusal before April 1, 2002, and that they waived their rights because they waited until April 17, 2002, to file this lawsuit.

 "When a right of first refusal is initially granted, it is a dormant set of rights that does not entitle the holder to take any action until receipt of a bona fide offer." *Beiger Heritage Corp. v. Estate of Kilbey*, 667 N.E.2d 184, 186 (Ind.Ct.App. 1996), *reh'g denied, trans. denied.* Once a holder receives notice of the offer from the property owner, the right of first refusal is "transmuted into an option." *Id.* "An option is a continuing offer whose duration and method of exercise is strictly con-

trolled by the agreement that created it." *Id.*

When McGehee agreed to the right of first refusal, the Elliotts were granted a "dormant set of rights" that did not entitle them to take any action until they received notice of the offer. *Id.* The trial court found that the Elliotts did not receive notice of Hasewinkel's offer, and there is evidence to support this finding. When McGehee sold Tract 3 to Hasewinkel without giving the Elliotts the opportunity to exercise their right of first refusal, McGehee's breach of the agreement was complete. At that point, the Elliotts were not required to act on their right of first refusal before April 1, 2002. Rather, the only time limitation at that point was the statute of limitations on a breach of contract action. See Ind.Code § 34–11–2–11. The trial court's findings regarding McGehee's breach of the Elliotts' right of first refusal are not clearly erroneous.

## II.

■ The next issue is whether the trial court's judgment regarding damages is clearly erroneous. The trial court awarded damages of $317,236 to the Elliotts. This damage award included the following: (1) $40,500 for the construction of a road and bridge across the ravine on Tract 2; (2) $115,200 for lost profits on Tract 2 for a six-year period; (3) $155,256 for lost profits on Tract 3 for a six-year period; (4) $1,280 for the profit made by McGehee in selling Tract 3 to Hasewinkel; and (5) $5,000 in attorney fees. McGehee make numerous arguments regarding the damage award, including that the lost profits are speculative, that the lost profits on Tract 3 are erroneous because of the restrictive covenants on Tract 3, that the lost profits on Tract 2 were unforeseeable, that the future lost profits must be discounted to the present value, that the Elliotts were awarded a double recovery for lost profits on Tract 2 plus the construction of the bridge, and that the attorney fee award is not supported by proper evidence.

■ While some of McGehee's arguments have merit, we resolve this issue on a basis different than that argued by McGehee.[2] We conclude that the measure

---

2. Even if the proper measure of damages included lost profits, we agree with McGehee that the lost profits awarded to the Elliotts are based upon speculation. In general, "[c]onsequential damages may include lost profits, providing the evidence is sufficient to allow the trier of fact to estimate the amount with a reasonable degree of certainty and exactness." *Clark's Pork Farms v. Sand Livestock Sys.*, 563 N.E.2d 1292, 1298 (Ind.Ct.App. 1990). A trier of fact "may not award damages on the mere basis of conjecture and speculation." *Farm Bureau Mut. Ins. Co. v. Dercach*, 450 N.E.2d 537, 540 (Ind.Ct.App. 1983). Although lost profits need not be proved with mathematical certainty, it would be "wholly improper for a [trier of fact] to project a past approximate weekly net profit into the future for an indefinite time and without evidence that such projection was at least reasonably certain." *Jerry Alderman Ford Sales, Inc. v. Bailey*, 154 Ind.App. 632, 654, 291 N.E.2d 92, 107 (1972), *reh'g denied*, 154 Ind.App. 632, 294 N.E.2d 617 (1973). Here, Travis Elliott testified that he could not "come up with an accurate figure" for his current profits on the sheep farming operation on Tract 2. Transcript at 211. He testified that it would be "roundabout." *Id.* Later he testified that he believed that he was currently "producing" $496 per acre per year and that he had "no reason to believe" that he could not produce the same amount of money on the rest of Tract 2. *Id.* at 230. However, Travis also testified that the $496 per acre was "just a basic per head, on the hoof, bottom lot, bottom, bottom dollar, general, general, general farmers estimate." Transcript at 226. Moreover, McGehee introduced the Elliotts' federal income tax returns for 2000 and 2001, in which the Elliotts claimed income from farming (not net profit) of only $3,017 and $2,635 respectively. Thus, the Elliotts' claimed net farming *profits* were greater than their farming *income* claimed on their 2000 and 2001 federal income taxes.

of damages awarded in this case is improper. In *Stoneburner*, we held that "the general measure of damages for a vendor's failure or refusal to convey land is usually based on the difference between the contract price and the market value of the land at the time of the breach plus the return of any payment made, with interest, commonly referred to as loss of the bargain." *Stoneburner*, 408 N.E.2d at 551. We reaffirmed this principle in *Annon II, Inc. v. Rill*, where we held:

> [T]he general measure of damages for a seller's failure or refusal to convey land is usually based on the difference between the contract price and the fair market value of the land at the time of the breach, plus the return of any payment made with interest. See *Arlington State Bank v. Colvin* (1989), Ind. App., 545 N.E.2d 572, 575, *trans. denied; Goodwine v. Kelley et al.* (1904), 33 Ind. App. 57, 61–62, 70 N.E. 832, 834; see also *Stoneburner v. Fletcher* (1980), Ind. App., 408 N.E.2d 545, 551 (customary measure of damages as difference between contract price and market value found inapplicable because difference between contract price and market price was zero); *Farmers' & Citizens' Building, Loan & Savings Association v. Rector* (1899), 22 Ind.App. 101, 102–103, 53 N.E. 297, 298 (difference between contract price and fair market value is measure of damages for purchaser's breach of contract); but see *Large v. Gregory* (1981), Ind.App., 417 N.E.2d 1160, 1163–64 (suggests that Indiana follows the English rule of contract dam-

ages, namely, that only if bad faith shown will buyer recover difference between contract price and market value; however, recognizes cases to the contrary and never directly decides whether English rule or American rule was applicable because damages sought by buyer were not compensable). This measure is referred to as the loss of the bargain. *Arlington*, 545 N.E.2d at 576. It is the fair market value at the time of the breach that is controlling. *Id.*

597 N.E.2d 320, 326 (Ind.Ct.App.1992), *reh'g denied, trans. dismissed.* In *Annon II*, we noted that evidence of future profits is relevant but only as it applies to the fair market value of the property on the date of the breach. *Id.*

 The damages awarded here clearly violate this measure of damages.[3] Although McGehee did not argue this principle on appeal, as stated in *John's Cash Furniture Stores v. Mitchell*, 126 Ind.App. 231, 238, 125 N.E.2d 827, 830 (1955), *reh'g denied:*

> While we are not required to search for errors not made manifest in the record as it is presented to us, we are not so restricted that we must close our eyes to that which is clearly before us. If we were limited entirely to the argument of counsel in reaching our decisions, to the exclusion of our own observation, we would many times permit gross injustice to prevail, and our oath to discharge our duties honestly and impartially would be a fruitless, futile and hypocritical gesture.

---

We conclude that the Elliotts' estimate of their future lost profits was speculative.

3. We also find the following quotation to be appropriate here: "It is not merely milkmaids who have rosy dreams as to the large gains to be made by selling the chickens to be hatched from the eggs to be bought with the price of

the milk that was spilled by the defendant." *Indiana & Michigan Elec. Co. v. Terre Haute Industries, Inc.*, 507 N.E.2d 588, 607 (Ind.Ct. App.1987) (quoting 5 A. CORBIN, § 1022 at 138) (noting that the evidence presented was "wholly conjectural"), *reh'g denied, trans. denied.*

126 Ind.App. at 238, 125 N.E.2d at 830. *See also Kellogg v. City of Gary*, 562 N.E.2d 685, 708 (Ind.1990) (holding that a trial court's judgment allowed a double recovery for a single wrong and "[t]his constitutes fundamental error which cannot be waived"). *Indiana Revenue Bd. v. Hansbrough*, 275 Ind. 426, 433–434, 417 N.E.2d 311, 315–316 (Ind.1981) ("While the specific question of the stipulated facts was not raised in appellant's briefs, this court, while not required to search the record for errors is not so restricted that it must close its eyes to what is clearly before it.") (quoting *Bruggner v. Shaffer*, 138 Ind.App. 183, 187, 210 N.E.2d 439, 441–42 (1965)); *Sanford v. State*, 255 Ind. 542, 544, 265 N.E.2d 701, 703 (Ind.1971) ("We have previously held that although we are not required to search the record for errors, we are not so restricted that we must close our eyes to what is clearly before us."); *INS Investigations Bureau, Inc. v. Lee*, 784 N.E.2d 566, 577 (Ind.Ct.App.2003) (holding that the "law disfavors a windfall or a double recovery"), *trans. denied.* We need not close our eyes to the improper damages award that is clearly before us. We conclude that the damages awarded by the trial court are clearly erroneous, and we remand for proceedings consistent with this opinion.[4]

For the foregoing reasons, we affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

Affirmed in part, reversed in part, and remanded.

NAJAM, J., and ROBB, J., concur.

---

4. On remand, the trial court should also reconsider the attorney fees award. Although a trial court may take judicial notice of what constitutes a reasonable amount of attorney fees, "[s]uch practice should be limited to routine cases involving relatively small amounts." *Zebrowski and Associates, Inc. v. City of Indianapolis*, 457 N.E.2d 259, 264 (Ind.Ct.App.1983). "When the amount of the fee is not inconsequential, there must be objective evidence of the nature of the legal services and the reasonableness of the fee." *Stepp v. Duffy*, 654 N.E.2d 767, 775 (Ind.Ct. App.1995), *trans. denied.* "In determining what a reasonable amount of attorney fees would be in a particular case, consideration should be given to the nature and difficulty of the litigation; the time, skill, and effort involved; the fee customarily charged for similar legal services; the amount involved; and the time limitations imposed by the circumstances." *Zebrowski*, 457 N.E.2d at 264. The only evidence presented regarding the Elliotts' attorney fees was Tamara Elliott's trial testimony that they had incurred between five and eight thousand dollars at that time.